**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| KWEILIN WOFFORD, TARA SEARS, and NICKI ODELL, individually and on behalf of others similarly situated, | ) ) ) | No. 2:20-cv-00084-RJC |
| | ) | |
| Plaintiffs, | ) | Judge Robert J. Colville |
| | ) | |
| v. | ) | |
| | ) | |
| SEBA ABODE, INC., D/B/A BRIGHTSTAR CARE and RANJANA ROY, as Administratrix of the Estate of Uday Sankar Roy, Deceased, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Robert J. Colville, United States District Judge

Before the Court is the Motion for Class Certification ("Motion to Certify") (ECF No. 87) filed by Plaintiffs Kweilin Wofford and Tara Sears ("Plaintiffs").[1]  Plaintiffs move, pursuant to Fed. R. Civ. P. 23, for class certification of their claims under the Pennsylvania Minimum Wage Act ("PMWA"), 43 P.S. §§ 331.101 et seq., and the common law doctrine of unjust enrichment, as set forth in Counts II and III of their operative Second Amended Complaint (ECF No. 55) ("Complaint") against Defendants Seba Abode, Inc. D/B/A BrightStar Care ("Seba Abode") and Ranjana Roy, as Administratrix of the Estate of Uday Sankar Roy, Deceased (collectively, "Defendants").  Plaintiffs seek certification of the following proposed class as to their claims under the PMWA asserted in Count II of the Complaint (the "PMWA Class"):

> All present and former non-exempt employees of Seba Abode, Inc. who were paid a reduced hourly rate as a result of working over 40 hours per workweek at any time from January 17, 2017 through the present.

---

[1] Plaintiff Nicki Odell does not seek appointment as a class representative.  Mot. 1 n.1, ECF No. 87.

Mot. ¶ 7, ECF No. 87.  Plaintiffs further seek certification of the following proposed class with respect to their claims under the common law doctrine of unjust enrichment under Pennsylvania law asserted in Count III of the Complaint (the "Unjust Enrichment Class"):

> All present and former non-exempt employees of Seba Abode, Inc. who were paid a reduced hourly rate as a result of working over 40 hours per workweek at any time from January 17, 2016 through the present.

Mot. ¶ 8, ECF No. 87.  Plaintiffs request that the Court appoint Ms. Wofford and Ms. Sears as class representatives, and that the Court appoint the attorneys who have entered appearances in this matter from the law firms of Feinstein Doyle Payne & Kravec, LLC and Jubelirer Pass & Intrieri, P.C. to represent both classes.

The Court has jurisdiction over Plaintiffs' Fair Labor Standard Act ("FLSA") claim pursuant to 28 U.S.C. § 1331, and has supplemental jurisdiction over their state-law claims pursuant to 28 U.S.C. § 1367.  The Motion to Certify has been fully briefed and is ripe for disposition.

## I.        Factual Background & Procedural History

Plaintiffs filed the Complaint on July 29, 2021, following this Court's Memorandum Order (ECF No. 54) permitting the same.  The Complaint differed from the First Amended Complaint in one respect, it added Plaintiffs Ms. Sears and Ms. Odell as named Plaintiffs and proposed class representatives.  *See* ECF No. 46 at 1.  Accordingly, the Court borrows heavily from its prior Memorandum Opinion at ECF No. 52 in describing the facts of this case, and supplements its prior description where warranted.

Plaintiff Kweilin Wofford worked for Defendants as a home health care companion beginning in March of 2018 and worked out of Defendants' Monroeville office as a member of the "BrightStar Monroeville Southeast Team" until May of 2020.  Compl. ¶¶ 1; 33, ECF. No. 55.

Ms. Sears and Ms. Odell also worked for Defendants as home health care companions.  *Id.* at ¶¶

2-3.  Home health care companions provide assistance to elderly individuals and individuals with

disabilities in their homes, and such individuals are Defendants' clients.  *Id.* at ¶ 31.  Home health

care companions receive an hourly wage.  ECF No. 92-1 at ¶ 5.  Seba Abode, Inc. operates four

franchises of BrightStar Care in Pennsylvania, including in Erie, Monroeville, Cranberry, and Mt.

Lebanon.  Compl. ¶ 44, ECF. No. 55

      At or around the time Ms. Wofford was hired, she received a document titled "Orientation

Program Guidelines," which provided, in pertinent part:

> C. You are responsible for keeping track of your own hours.  You may work no
> more than forty hours weekly to remain at your base rate of $9/hour.  You are not
> required to work overtime.  Therefore, if you choose to work overtime (above 40
> hours per week), you are subject to a pay adjustment which will be announced to
> you in writing prior to the change.

ECF No. 88-9.  Ms. Wofford asserts that her actual beginning hourly pay rate was $10 per hour

and that, with the exception of a few workweeks in which her hourly pay rate increased, Ms.

Wofford regularly received payment from April 20, 2018 through June of 2019 based upon a "split

rate arrangement" of $10.00 per hour for work performed on weekdays and $11.00 per hour for

work performed on weekends.  Compl. ¶¶ 36-37, ECF No. 55.

      With the exception of one workweek, Ms. Wofford worked less than 40 hours per

workweek from the beginning of her employment until December of 2018.  *Id.* at ¶ 38.  Beginning

in December of 2018, Ms. Wofford began working four 12-hour shifts weekly, for a total of 48

hours per workweek, and was compensated for the next several months in accordance with a

$10/$11 per hour split rate arrangement and received one and one-half times her "regular rate" of

pay for hours worked over 40 in a workweek.[2]  *Id.* at ¶¶ 39-42.  On May 9, 2019, Ms. Wofford

received an email from Defendants' Vice President of Operations that provided:

> I understand that you are currently working and [sic] average of 48 hours per weeks
> [sic] and you are scheduled for the same number of hours going forward, which
> puts you in an overtime situation.  We offer our employees opportunity to work
> overtime (at their own choice) but, unfortunately, it requires an adjustment in the
> employee's hourly pay rate.  <u>In your case, it means, going forward your pay rate
> will be $9.25 per hour.</u>
>
> Please note that you also have a choice to work only up to 40 hours per week which
> will not require any adjustment in your pay rate.  Please call your office or email
> us immediately – if you wish to go with that choice.  Also, please note that once
> you choose to work overtime and your hour pay rate is adjusted, it won't be revised
> again, if you do not work overtime for a week in between or if you are still
> scheduled to work overtime.  It will only be adjusted back to the prior rate once you
> have worked two consecutive weeks with 40 hours or less and you no longer are
> scheduled more than 40 hours per week.

ECF No. 88-10; Compl. ¶ 43, ECF No. 55.

Ms. Wofford was first paid a reduced pay rate of $9.75 per hour in June of 2019.  Compl.

¶ 45, ECF No. 55.  In some workweeks from June of 2019 through December of 2019, Ms.

Wofford was compensated at a rate of $9.75 for all hours worked up to 40 hours per workweek,

and was paid overtime of one and one-half the rate of $9.75 for hours worked in excess of 40 per

workweek.  *Id.* at ¶ 47.  In other workweeks from June of 2019 through January of 2020, Ms.

Wofford was paid a split rate for all hours worked up to 40 hours per workweek, and was paid

overtime of one and one-half her "weighted average regular rate," which was affected by a reduced

regular wage and calculated in the manner discussed above in Footnote 1, for hours worked in

excess of 40 per workweek.  *Id.* at ¶ 48.  In August of 2019, Ms. Wofford was paid at a rate of

$9.75 per hour or at a split rate for all hours worked during two workweeks, and was paid no

overtime compensation despite Ms. Wofford having worked in excess of 40 hours during those

---

[2] Plaintiffs' overtime compensation was calculated utilizing a "weighted average regular rate," Compl. ¶¶ 41-42, ECF
No. 55, and Plaintiffs do not challenge this method of calculation, *id.* at ¶ 42 n.1.

workweeks.  *Id.* at ¶ 49.  Ms. Wofford asserts that she was subjected to a "pay deduction" in her "regular rate" beginning in June of 2019, and that the same continued beyond January of 2020.  *Id.* at ¶¶ 50-51.

Ms. Sears and Ms. Odell allege that they were also subject to this same "pay deduction" practice.  Compl. ¶ 52, ECF No. 55.  Ms. Sears was hired in April of 2019 and Ms. Odell was hired in October of 2019, and each received a signed offer letter explaining that they would receive the "split rate arrangement" of $10.00 per hour for work performed on weekdays and $11.00 per hour for work performed on weekends.  *Id.* at ¶¶ 53-54.  Each was paid according to this split rate arrangement until November of 2019, when they received emails from Seba Abode's Branch Directors that were "effectively identical to those sent Ms. Wofford, with the exception of the fact that the emails to Ms. Sears and Ms. Odell indicated that because they were scheduled to work '84 hours' per week, if they continued to work those hours going forward their pay rates would be '$8.30 per hour.'"  *Id.* at ¶ 56.  Thereafter, Ms. Sears and Ms. Odell were paid at a reduced hourly rate of $8.30.  *Id.* at ¶ 57.

In alleging Defendants' pay practices, Plaintiffs also cite to the "BrightStar Care Employee Handbook" ("Employee Handbook"), *see* Compl. Ex. A, ECF No. 55-1,[3] which provides:

**2.2 Types of Worker**

This section distinguishes between the different types of workers the Company employs.  Employee status is established at the time of hire and may only be altered via a written statement signed by the Company.

*Exempt vs Non-Exempt*
The majority of employees are non-exempt, meaning they are entitled by law to at least minimum wage and premium pay for overtime.  Exempt employees are not subject to these laws.  Exempt status is defined by particular standards set by state law and the Federal Labor Standards Act (FLSA).  This class of employee is usually an executive, an administrator, or a highly paid specialist such as a programmer.

---

[3] Defendants refer to this document as "Seba Abode's 2016 Employee Handbook."  Answer ¶ 22, ECF No. 62.

*Regular Employees*
Regular employees work a regular schedule, either on a full-time or part-time basis. All field employees are hired as part-time due to their own availability which must match the hours available by our clients. To be considered full-time, an employee must work a maximum of 40 hours per week. Any regular employee who chooses to work above 40 hours a week is able to do so, but will be subject to a deduction in pay as based upon the number of hours agreed to per week at the discretion of the Payroll department.

Compl. Ex. A at 5, ECF No. 55-1. The Employee Handbook further provides:

**3.2 Wages**

Wages vary from employee to employee and are based on level of skill and the needs of our clients. The Company conducts regular evaluations of all employees and issues promotions as it sees fit. Orientation for all regular employees in [sic] paid after all pre-employment forms are submitted and the employee works 40 hours.

In additional [sic] to regular pay, employees may have the option of earning overtime pay.

*Overtime*
A non-exempt employee may work overtime on the terms defined by Pennsylvania law pending prior authorization by his or her manager. As mentioned previously, any employees [sic] who chooses to work above 40 hours per week on an ongoing and continuous basis, will be subject to a pay deduction based on the number of hours works per week. All deductions will be announced prior to the change, as dictated by Pennsylvania law.

ECF No. 88-8 at 4. Defendants ceased utilizing the rate reduction policy in March of 2020. Br. in Supp. 8-9, ECF No. 88.

In calculating the new rate of pay an employee would receive going forward if they continued to work overtime, Defendants utilized a formula contained in an Excel spreadsheet titled the "Field Employee Pay Calculator." *See* Br. in Supp. 5, ECF No. 88; *see also* ECF No. 88-2 at ¶ 21. Plaintiffs aver, and the evidence supports, that "[t]he purpose of the formula was that the employee's weekly earnings with time and a half for overtime at the new, lower pay rate would approximate what the employee would have earned had she been paid at straight time for all hours

worked—i.e., her regular rate without a time and a half." *See* ECF No. 88-3 at 76:13-23 (Uday Roy explaining: "Ten dollar an hour, they work 50 hours, so base rate is $400 up to 40 hours. And then for 10 hours, it would be time and a half. So, that would be 15 dollar an hour for the overtime hours. So, for 10 hours, it will be $150. So, overall they're making $550 if we -- they remained in 50 hours in that way. *So, what we did is that we basically calculated what adjustments is required in their base pay rate so that they do not get less than $500 for working 50 hours*[,]" i.e., $10 per hour (their prior regular rate) multiplied by 50 hours (emphasis added)).

Plaintiffs correctly note that the Court has already conditionally certified a collective under the FLSA consisting of collective members who were paid at a reduced rate from July 22, 2018 through the present, and that the definition of the collective is the same as the class definitions proposed in the Motion to Certify, except for the relevant time frame. Mot ¶ 9, ECF No. 87. Plaintiffs filed the Motion to Certify, along with a Brief in Support and Exhibits (ECF No. 88), on December 16, 2021. Defendants filed a Response in Opposition (ECF No. 91), along with Exhibits (ECF No. 92), on February 1, 2022. Plaintiffs filed a Reply on February 14, 2022.

## II.    Legal Standard

Federal Rule of Civil Procedure 23 provides the applicable requirements for class certification. The Supreme Court of the United States has explained:

> Rule 23(a) states four threshold requirements applicable to all class actions: (1) numerosity (a "class [so large] that joinder of all members is impracticable"); (2) commonality ("questions of law or fact common to the class"); (3) typicality (named parties' claims or defenses "are typical ... of the class"); and (4) adequacy of representation (representatives "will fairly and adequately protect the interests of the class").

*Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 613 (1997) (quoting Kaplan, Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (I), 81 Harv. L.Rev. 356, 375–400 (1967)). "In addition to satisfying Rule 23(a)'s prerequisites, parties seeking

class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)."[4]

*Amchem Prod., Inc.*, 521 U.S. at 614.

"To qualify for certification under Rule 23(b)(3), a class must meet two requirements beyond the Rule 23(a) prerequisites: Common questions must 'predominate over any questions affecting only individual members'; and class resolution must be 'superior to other available methods for the fair and efficient adjudication of the controversy.'" *Amchem Prod., Inc.*, 521 U.S. at 615 (quoting Fed. R. Civ. P. 23(b)(3)).  "In adding 'predominance' and 'superiority' to the qualification-for-certification list, the Advisory Committee sought to cover cases 'in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'"  *Id.* (quoting Adv. Comm. Notes, 28 U.S.C. App., p. 697).  Rule 23(b)(3) lists the following non-exhaustive factors to be considered in determining whether the proposed class meets the predominance and superiority requirements:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).  The Third Circuit further "requires that a Rule 23(b)(3) class also be 'currently and readily ascertainable.'" *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 469 (3d Cir. 2020) (quoting *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012)).  Plaintiffs must show that "(1) the class is defined with reference to objective criteria; and (2) there is a reliable and

---

[4] In the present case, Plaintiffs rely on Rule 23(b)(3) in seeking certification.

administratively feasible mechanism for determining whether putative class members fall within the class definition." *Hargrove*, 974 F.3d at 469–70 (quoting *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015)).

Each of the requirements of Rule 23 must be met for class certification to be granted, and factual determinations must be made by a preponderance of the evidence. *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3d Cir. 2015) (quoting *In re Hydrogen Peroxide Antitrust Litigation*, 552 F.3d 305, 307 (3d Cir. 2008)). "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage[,]" and "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

## III.    Discussion

Plaintiffs bring this purported class action on behalf of all similarly situated individuals who were subject to Defendants' alleged policy of subjecting their employees to pay rate reductions if those employees worked over forty (40) hours per workweek.[5]  Compl. ¶ 72-73, ECF No. 55.  In support of their assertion that this case should be certified as a class action under Fed. R. Civ. P. 23, Plaintiffs aver that over one hundred individuals were subjected to the rate reduction policy, and that the number of class members is thus large enough that joinder of individual members in this action is impracticable. *Id.* at ¶ 74.  They assert that there exist common questions of law and fact among the class, including whether Defendants' practice violates class members' rights under the PMWA, and whether Defendants were unjustly enriched by this practice, and that, for the same reason, the claims of class members are typical of the claims of the Plaintiffs, and

---

[5] The Court will refer to this policy as the "rate reduction policy" throughout this Memorandum Opinion, consistent with the terminology utilized by Plaintiffs in the Motion to Certify and relevant briefing.

there is no conflict between Plaintiffs and any other class member.  *Id.* at ¶¶ 75-76.  Plaintiffs further aver that they will fairly and adequately protect the interests of the classes, and that the attorneys for Plaintiffs are experienced and capable class action litigators and will fairly and adequately represent the interests of the classes.  *Id.* at ¶ 77.

The PMWA requires that employers pay employees for hours worked above forty hours in a work week at a rate "not less than one and one-half times the employee's regular rate."  43 P.S. § 333.104(c).  With respect to unjust enrichment, the Third Circuit has explained:

> "An action based on unjust enrichment is an action which sounds in quasi-contract or contract implied in law."  *Discover Bank v. Stucka*, 33 A.3d 82, 88 (Pa. Super. 2011) (citation omitted).  "The elements of unjust enrichment are [ (1)] benefits conferred on defendant by plaintiff, [ (2)] appreciation of such benefits by defendant, and [ (3)] acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value."  *Id.*  "Whether the doctrine applies depends on the unique factual circumstances of each case[.]"  *Id.* (citation omitted).
>
> "To sustain a claim of unjust enrichment, a claimant must show that the party against whom recovery is sought either wrongfully secured or passively received a benefit that it would be unconscionable for her to retain."  *Gutteridge v. J3 Energy Group, Inc.*, 2017 PA Super 150 at *6, 165 A.3d 908(2017) (en banc) (citation omitted).  "The doctrine does not apply simply because the defendant may have benefited as a result of the actions of the plaintiff."  *Id.* (citation omitted).

*Mark Hershey Farms, Inc. v. Robinson*, 171 A.3d 810, 817 (Pa. Super. 2017).

With respect to the Rule 23(b) requirements, Plaintiffs assert that the prosecution of separate actions by individual members of the classes would create a risk of inconsistent adjudications that would establish incompatible standards of conduct for Defendants, that Defendants have acted on grounds generally applicable to the classes by subjecting each class member to the rate reduction policy, and that, alternatively, this action is maintainable as a class action under Federal Rule of Civil Procedure Rule 23(b)(3), as "common questions of law and fact predominate over any questions affecting only individual members, and a class action is superior

to other available methods for the fair and efficient adjudication of the controversy."  Compl. ¶¶ 78-80, ECF No. 55.

Defendants assert that the Motion to Certify should be denied because "(1) questions affecting individual putative class members predominate over common questions, (2) Plaintiffs' claims are not typical of the claims of the class, and (3) class-wide adjudication is not the superior method for adjudication of the claims in this case."  Resp. 10, ECF No. 91.  More specifically, Defendants assert that the PMWA permits an employer and employee to agree to a new rate of pay prior to performance of work, and where the employee is paid time and one-half the new rate for any hours worked in excess of forty in a workweek. Resp. 1, ECF No. 91.  Defendants assert that common evidence cannot be introduced, and that individual issues will predominate, because Plaintiffs will be required to show whether each individual in the putative class understood and agreed to any rate changes before performing any work at the new rate.  *Id*.  With respect to the Unjust Enrichment class, Defendants further argue that evaluation of the unjust enrichment claims will involve individualized assessment of whether Seba Abode offered, and each Plaintiff accepted, a contract, as the doctrine of unjust enrichment is inapplicable where there is a contract between the parties.  *Id.* at 2.  Relying on these arguments, Defendants assert that Plaintiff cannot satisfy the commonality, typicality, predominance, and superiority requirements for Rule 23 class certification.

### A.  Numerosity

"No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met."  *Stewart v. Abraham*, 275 F.3d 220, 226–27 (3d Cir. 2001).  Plaintiffs assert that 141 employees were paid a reduced hourly rate because they worked

overtime within the relevant time period, and that 83 employees, including Plaintiffs, had been subjected to the rate reduction policy and paid a reduced rate since July 22, 2018. Br. in Supp. 10-11, ECF No. 88. Defendants do not challenge these assertions. The Court finds that the numerosity requirement has been established in this matter.

### B. Commonality

With respect to commonality, the United States Court of Appeals for the Third Circuit has explained:

> Federal Rule of Civil Procedure 23(a)(2) merely requires that there be "questions of law or fact common to the class[.]" Commonality does not require perfect identity of questions of law or fact among all class members. Rather, "even a single common question will do." [*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011)] (quotation marks and alterations omitted); *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir.1994) (discussing how Rule 23(a)(2) "is easily met[ ]"). "A putative class satisfies Rule 23(a)'s commonality requirement if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382 (3d Cir.2013) (internal quotation marks omitted). A court's focus must be "on whether the defendant's conduct [is] common as to all of the class members[.]" *Sullivan*, 667 F.3d at 298. "Again, th[e] bar is not a high one." *Rodriguez*, 726 F.3d at 382.

*Reyes v. Netdeposit, LLC*, 802 F.3d 469, 486 (3d Cir. 2015); *see also In re Cmty. Bank of N. Virginia Mortg. Lending Pracs. Litig.*, 795 F.3d 380, 399 (3d Cir. 2015) (approving of commonality finding where plaintiffs "alleged that the class was subjected to the same kind of illegal conduct by the same entities, and that class members were harmed in the same way, albeit to potentially different extents."). "What matters to class certification . . . is not the raising of common questions—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.* at 398 (quoting *Wal–Mart*, 131 S.Ct. at 2551).

In describing the core facts supporting the rate reduction policy utilized by Defendants, Plaintiffs provide:

Defendants maintained a uniform policy whereby hourly caregivers who regularly worked over 40 hours in a week were forced to either (1) continue working over 40 hours per week at a rate less than their regular hourly rate or (2) suffer a reduction in their work schedule to 40 hours or less per week.  Created by Mr. Roy, this rate reduction policy was detailed in a Seba Abode policy document titled "Policy #2014-07" approved by its Board of Directors and reflected in a Seba Abode Employee Handbook and its "Orientation Program Guidelines."  To implement the policy, the company's management periodically reviewed caregivers' pay records to determine if any of them worked more than 40 hours per week.  If so, Seba Abode management would force the employee to either (1) continue working over 40 hours per week at a rate less than their regular hourly rate or (2) suffer a reduction in their work schedule to 40 hours per week.

Seba Abode management determined the new, lower rate of pay by using a formula contained in an Excel spreadsheet titled "Field Employee Pay Calculator."  The purpose of the formula was that the employee's weekly earnings with time and a half for overtime at the new, lower pay rate would approximate what the employee would have earned had she been paid at straight time for all hours worked—i.e., her regular rate without a time and a half.  When a caregiver continued working over 40 hours per week, her "base rate" was changed to below her regular rate of pay in Seba Abode's internal system and in the payroll system with ADP.  If a caregiver worked fewer than 40 hours per week, she continued to receive her regular rate of pay.

Br. in Supp. 4-5, ECF No. 88 (footnotes and citations omitted).  Plaintiffs allege that they, and each of the potential class members, were, in fact, impacted by this policy, in that their regular rates of pay were reduced when they continued to work overtime after being contacted by Defendants.  *Id.* at 6-8.

When considering whether the commonality requirement was satisfied in a case involving a discretionary corporate policy that allegedly had a discriminatory effect, the Third Circuit explained that, "to bring a case as a class action, the named plaintiffs must show that each class member was subjected to the specifically challenged practice in roughly the same manner."  *In re Cmty. Bank*, 795 F.3d at 398-99.  Plaintiffs assert that the essential facts apply to each class member, and that the outcomes of their claims will thus be the same.  More specifically, they aver:

As to the PMWA Class, the question is whether Defendants' policy violates the PMWA's mandate that employers pay employees for hours above 40 in a week at

a rate "not less than one and one-half times the employee's regular rate." *See* 43 P.S. § 333.104(c). The answer will be the same for each class member, so the commonality requirement is readily met.

. . . .

The same is true of the Unjust Enrichment Class. To prevail, the class must show that (1) they conferred benefits upon Defendants, (2) which were appreciated by Defendants, and (3) in circumstances where it would be inequitable for Defendants to retain the benefit without payment of value. *See, e.g., Mark Hershey Farms, Inc. v. Robinson*, 171 A.3d 810, 817 (Pa. 2017). Plaintiffs' unjust enrichment claims are premised on the theory that the rate reduction policy and practice was illegal under the FLSA and/or PMWA, and so any "agreements" to work at the reduced rates are void and invalid under Pennsylvania law. . . . Restatement (Third) of Restitution and Unjust Enrichment § 32 specifically provides that where "[a] person who renders performance under an agreement that is illegal or otherwise unenforceable for reasons of public policy may obtain restitution from the recipient . . . whether or not necessary to prevent unjust enrichment, if restitution is required by the policy of the underlying prohibition." Here, the policy that renders contracts that violate overtime laws void necessarily requires that the employers adhere to those laws. Thus, Plaintiffs seek to obtain restitution of what they would have earned absent Defendants' illegal rate reduction.

Br. in Supp. 11-13, ECF No. 88.

Plaintiffs assert that this case involves a uniform employment practice, i.e., the rate reduction policy. Br. in Supp. 11, ECF No. 88. In asserting that Plaintiffs have not established commonality, Defendants assert:

Due to the unique facts surrounding whether a caregiver understood or agreed to a proposed change to their rate of pay, answering whether Plaintiff Wofford or Plaintiff Sears were paid the correct overtime rate under the PMWA or Pennsylvania common law does not answer the question or advance the resolution of the claim for any other putative class member. Rather, each class member must testify in order to assess whether they understood or agreed to any proposed rate change.

Resp. 14, ECF No. 91. In arguing a lack of predominance, Defendants advance the following similar argument, which the Court finds relevant to commonality:

Plaintiffs' PMWA and unjust enrichment claims fail because they turn on an express agreement between each of the individual Plaintiffs and Seba Abode. Defendants gave Plaintiff Wofford, Plaintiff Sears, and other caregivers the choice

14

to either remain at their current rate of pay and work 40 hours or fewer per week or agree to a reduction in pay if they wanted to work over 40 hours per week. Some employees accepted the reduced rate and continued working regular overtime hours at the modified hourly rate. Other employees specifically opted out of overtime and retained their original base rate, while still others, like Plaintiff Sears, continued to work the overtime hours, [were] paid the lower rate of pay, but contested the lower rate. There is no record evidence suggesting that Defendants exerted undue pressure on any employees to force them toward either option. Nor is there any proof that Defendants deprived any employees of compensation under the terms of either arrangement.

As a result, an individualized evaluation of the facts surrounding the offer, acceptance, and other contractual terms regarding each individual putative class member's agreement to be paid a reduced hourly rate in exchange for continuing to work overtime is required. The determination of whether an agreement existed between the individual and Seba Abode, and the terms of agreement if one is found to exist, rests on facts unique to each worker.

Resp. 16, ECF No. 91 (citations omitted).

In so arguing, Defendants cite to the following from the Pennsylvania Administrative Code:

(d) No employer may be deemed to have violated these §§ 231.41--231.43 by employing an employee for a workweek in excess of the maximum workweek applicable to the employee under § 231.41 if, *under an agreement or understanding arrived at between the employer and the employee before performance of the work*, the amount paid to the employee for the number of hours worked by the employee in the workweek in excess of the maximum workweek applicable to the employee under § 231.41:

. . . .

(3) Is computed at a rate not less than 1 1/2 times the rate established by the agreement or understanding as the basic rate to be used in computing overtime compensation thereunder; and if the average hourly earnings of the employee for the workweek, exclusive of payments described in subsection (a)(1)--(7), are not less than the minimum hourly rate required by applicable law and if extra overtime compensation is properly computed and paid on other forms of additional pay required to be included in computing the regular rate.

34 Pa. Code § 231.43(d)(3) (emphasis added). Perhaps tellingly, Defendants fail to cite to a single case wherein this provision has been applied, let alone one where it has been applied in this context.

The Court's own research reflects that the provision has been considered or discussed by courts almost exclusively in considering a "fluctuating workweek" overtime calculation, whereby an employer pays an employee a fixed weekly salary regardless of the hours worked in a given workweek and an additional one-half (as opposed to one and one-half) times the employee's regular weekly rate for hours worked above forty in a workweek.  Courts have ruled that such a scheme violates the PMWA.  *See Chevalier v. Gen. Nutrition Centers, Inc.*, 220 A.3d 1038, 1059 (Pa. 2019) ("Thus, we view the Secretary's silence as an intent to reject the 0.5 Multiplier of the [Fluctuating Workweek] Method in favor of the 1.5 Multiplier."); *see also Verderame v. RadioShack Corp.*, 31 F.Supp. 3d 702 (E.D. Pa. 2014) (rejecting fluctuating workweek method under PMWA); *Foster v. Kraft Foods Global, Inc.*, 285 F.R.D. 343 (W.D. Pa. 2012) (same); *Cerutti v. Frito Lay*, 777 F.Supp. 2d 920, 944-45 (W.D. Pa. 2011) (same).

In responding to Defendants' assertion respecting 34 Pa. Code § 231.43(d)(3), Plaintiffs provide:

> Defendants presented caregivers who regularly worked over 40 hours a week with the following financial dilemma: (1) accept an hourly rate of pay reduced below that which Defendants originally agreed to pay to them, or (2) face a reduction of their work schedule to 40 hours or less per week.  The putative class members here are those employees who were actually "paid a reduced hourly rate," so to extent they can be said to have had a "choice" between these two bad options (either of which would result in them making less money), all of them "chose" the first.  In short, any disputes between the parties as to whether class members should be characterized as having "agreed" to their reduced rates are semantic, not factual, and under the undisputed facts of this case, the answer to whether impacted employees "agreed" or not will be the same for all of them.

Reply 1, ECF No. 95.  In light of this argument, the Court believes that the Motion to Certify requires some inquiry into and discussion regarding the merits of Defendants' assertion respecting the purported agreements between Defendants and employees to overtime compensation less than what is typically mandated by the PMWA.  The same is permissible where class certification issues

are intertwined with merits issues. *See Amgen Inc.*, 568 U.S. at 466 ("Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."). In this matter, the Court is constrained to conclude that it cannot resolve the Motion to Certify without considering whether there is merit to Defendants' argument that the Court cannot resolve Plaintiffs claims on a class-wide basis without individually assessing whether each and every class member understood or agreed to a proposed change to their rate of pay.

Plaintiffs effectively concede that every class member "agreed" to make the "choice" to accept a lower rate when confronted with the rate reduction policy. To the extent that Plaintiffs' repeated italicizing, bolding, and utilization of quotation marks around the words "agree" and "choice" implies that the Plaintiffs and the class members intend to argue that they did not, in fact or as a matter of law, agree to the rate reduction policy, then Defendants are inevitably correct that individual issues will predominate, as the Court would have to resolve the knowledge, understanding, and manner of acceptance of each individual class member in deciding whether they, in fact or as a matter of law, reached an agreement, understanding, or contract with Defendants as to the rate reduction policy. Accordingly, the Court must determine whether there is a manner in which Plaintiffs' claims can be resolved on a class-wide basis.

With respect to Section 231.43(d), the Supreme Court of Pennsylvania has explained:

Pennsylvania's Regulation Subsection 231.43(d) expressly approves of an employment arrangement for overtime compensation involving "an agreement or understanding arrived at between the employer and the employee before performance of the work" in the following discrete situations: (1) "an employee employed at piece rates;" (2) an employee "performing two or more kinds of work for which different hourly or piece rates have been established;" or *(3) in cases involving an established "basic rate."*

*Chevalier*, 220 A.3d at 1057 (emphasis added).  The FLSA contains a similar provision, which provides:

> (g) Employment at piece rates
>
> No employer shall be deemed to have violated subsection (a) by employing any employee for a workweek in excess of the maximum workweek applicable to such employee under such subsection if, pursuant to an agreement or understanding arrived at between the employer and the employee before performance of the work, the amount paid to the employee for the number of hours worked by him in such workweek in excess of the maximum workweek applicable to such employee under such subsection—
>
>     . . . .
>
> (3) is computed at a rate not less than one and one-half times the rate established by such agreement or understanding as the basic rate to be used in computing overtime compensation thereunder: Provided, That the rate so established shall be authorized by regulation by the Administrator as being substantially equivalent to the average hourly earnings of the employee, exclusive of overtime premiums, in the particular work over a representative period of time;
>
> and if (i) the employee's average hourly earnings for the workweek exclusive of payments described in paragraphs (1) through (7) of subsection (e) are not less than the minimum hourly rate required by applicable law, and (ii) extra overtime compensation is properly computed and paid on other forms of additional pay required to be included in computing the regular rate.

29 U.S.C. § 207(g).

While the PMWA does not define what constitutes an "established basic rate," the regulations regarding application of the FLSA do provide guidance.  With respect to "Authorized Basic Rates," 29 C.F.R. § 548.3 provides:

> A rate which meets all of the conditions of § 548.2 and which in addition satisfies all the conditions set forth in one of the following paragraphs will be regarded as being substantially equivalent to the average hourly earnings of the employee, exclusive of overtime premiums, in the particular work over a representative period of time and may be used in computing overtime compensation for purposes of section 7(g)(3) of the Act, and § 548.2:
>
> (a) A rate per hour which is obtained by dividing a monthly or semi-monthly salary by the number of regular working days in each monthly or semi-monthly period

and then by the number or hours in the normal or regular workday.  Such a rate may be used to compute overtime compensation for all the overtime hours worked by the employee during the monthly or semimonthly period for which the salary is paid.

(b) A rate per hour which is obtained by averaging the earnings, exclusive of payments described in paragraphs (1) through (7) of section 7(e) of the Act, of the employee for all work performed during the workday or any other longer period not exceeding sixteen calendar days for which such average is regularly computed under the agreement or understanding. Such a rate may be used to compute overtime compensation for all the overtime hours worked by the employee during the particular period for which the earnings average is computed.

(c) A rate per hour which is obtained by averaging the earnings, exclusive of payments described in paragraphs (1) through (7) of section 7(e) of the Act, of the employee for each type of work performed during each workweek, or any other longer period not exceeding sixteen calendar days, for which such average is regularly computed under the agreement or understanding. Such a rate may be used to compute overtime compensation, during the particular period for which such average is computed, for all the overtime hours worked by the employee at the type of work for which the rate is obtained.

(d) The rate or rates which may be used under the Act to compute overtime compensation of the employee but excluding the cost of meals where the employer customarily furnishes not more than a single meal per day.

(e) The rate or rates (not less than the rates required by section 6(a) and (b) of the Act) which may be used under the Act to compute overtime compensation of the employee but excluding additional payments in cash or in kind which, if included in the computation of overtime under the Act, would not increase the total compensation of the employee by more than 40 percent of the applicable hourly minimum wage under either section 6(a) of the Act or the state or local law applicable in the jurisdiction in which the employee is employed, whichever is higher, per week on the average for all overtime weeks (in excess of the number of hours applicable under section 7(a) of the Act) in the period for which such additional payments are made.

(f)(1) A rate per hour for each workweek equal to the average hourly remuneration of the employee for employment during the annual period or the quarterly period immediately preceding the calendar or fiscal quarter year in which such workweek ends, provided: (i) It is a fact, confirmed by proper records of the employer, that the terms, conditions, and circumstances of employment during such prior period, including weekly hours of work, work assignments and duties, and the basis of remuneration for employment, were not significantly different from the terms, conditions, and circumstances of employment which affect the employee's regular rates of pay during the current quarter year, or differ only because of some change

19

in basic salary or similar nonfluctuating factor for which suitable adjustments have been made in the calculations to accurately reflect such change and (ii) such average hourly remuneration during the prior period is computed by the method or methods authorized in the following paragraphs.

(2) The average hourly remuneration on which the rate authorized in paragraph (f)(1) of this section is based shall be computed: (i) By totaling all remuneration for employment during the workweeks ending in the prior period (including all earnings at hourly or piece rates, bonuses, commission or other incentive payments, and other forms of remuneration paid to or on behalf of the employee) except overtime premiums and other payments excluded from the regular rate pursuant to provisions of section 7(e) of the Act, and (ii) by dividing the amount thus obtained by the number of hours worked in such prior period for which such compensation was paid.

(3) Where it is not practicable for an employer to compute the total remuneration of an employee for employment in the prior period in time to determine obligations under the Act for the current quarter year (as where computation of bonus, commission, or incentive payments cannot be made immediately at the end of the period), a one month grace period may be used. If this one month grace period is used, it will be deemed in compliance with paragraph (f)(1) of this section to use the basic rate authorized therein for the quarter commencing one month after the next preceding four-quarter or quarter-year period (whichever length period is adopted as the base period for the rate determination). Once the grace period method of computation is adopted it must be used for each successive quarter.

29 C.F.R. § 548.3.  The regulations explain this Section as follows:

Section 548.3 contains a description of a number of basic rates any one of which, when established by agreement or understanding, is authorized for use without prior specific approval of the Administrator.  These basic rates have been found in use in industry and the Administrator has determined that they are substantially equivalent to the straight-time average hourly earnings of the employee over a representative period of time.

29 C.F.R. § 548.300.

The FLSA regulations further provide:

The requirements of section 7 of the Act with respect to the payment of overtime compensation to an employee for a workweek longer than the applicable number of hours established in section 7(a) of the Act, will be met under the provisions of section 7(g)(3) of the Act by payments which satisfy all the following standards:

(a) Overtime compensation computed in accordance with this part and section 7(g)(3) of the Act is paid pursuant to an agreement or understanding arrived at between the employer and the employee or as a result of collective bargaining before performance of the work;

(b) A rate is established by such agreement or understanding as the basic rate to be used in computing overtime compensation thereunder;

(c) The established basic rate is a specified rate or a rate which can be derived from the application of a specified method of calculation;

(d) The established basic rate is a bona fide rate and is not less than the minimum hourly rate required by applicable law;

(e) The basic rate so established is authorized by § 548.3 or is authorized by the Administrator under § 548.4 as being substantially equivalent to the average hourly earnings of the employee, exclusive of overtime premiums, in the particular work over a representative period of time;

(f) Overtime hours are compensated at a rate of not less than one and one-half times such established basic rate;

(g) The hours for which the employee is paid not less than one and one-half times such established basic rate qualify as overtime hours under section 7(e)(5), (6), or (7) of the Act;

(h) The number of hours for which the employee is paid not less than one and one-half times such established basic rate equals or exceeds the number of hours worked by him in any workweek in excess of the maximum workweek applicable to such employees under subsection 7(a) of the Act;

(i) The employee's average hourly earnings for the workweek exclusive of payments described in paragraphs (1) through (7) of section 7(e) of the Act are not less than the minimum hourly rate required by this Act or other applicable law;

(j) Extra overtime compensation is properly computed and paid on other forms of additional pay which have not been considered in arriving at the basic rate but which are required to be included in computing the regular rate.

29 C.F.R. § 548.2.

The agreements as to basic rates that Defendants assert existed between Defendants and the class members in this case for rates lower than either the $10.00 or $11.00 regular rates do not, in this Court's estimation, match any of the descriptions set forth in 29 C.F.R. § 548.3. 29 C.F.R.

§ 548.3 speaks to methods of calculation where an employee is paid a salary, works a job where the rate of pay is more appropriately determined using a period longer or shorter than a workweek, performs more than one type of work during a workweek, receives a free daily lunch, receives incidental payments that have a trivial effect on the overtime compensation due, or earns commissions, recurring bonuses, and other incentive payments which are calculated based upon work performance over a substantial period of time.[6]

The FLSA "establishes only a national floor under which wage protections cannot drop, but more generous protections provided by a state are not precluded." *Chevalier*, 220 A.3d at 1055. "Pennsylvania and federal courts look to FLSA cases for guidance when interpreting substantially parallel provisions of the PMWA." *Beauregard v. Broadway Elec. Serv. Corp.*, No. 2:21-CV-1600, 2022 WL 2293969, at *4 (W.D. Pa. June 24, 2022) (citing *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 142 (3d Cir. 2020)). However, "Pennsylvania courts have departed from interpreting the PWMA in light of the FLSA where the legislative text and history of the PMWA do not follow that of the FLSA." *Wintjen v. Denny's, Inc.*, No. 2:19-CV-00069-CCW, 2021 WL 5370047, at *6 (W.D. Pa. Nov. 18, 2021); *see also Beauregard*, 2022 WL 2293969, at *4 ("Accordingly, the Pennsylvania General Assembly endeavored to provide 'more generous protections' to employees through enactment of the Pennsylvania Minimum Wage Act of 1968, 43 P.S. §§ 333.101–333.115." (quoting *Chevalier*, 220 A.3d at 1055)).

The Court has found no support for the argument set forth by Defendants that employees can reach an agreement or understanding as to a "basic rate" under the PMWA that is inconsistent with the "authorized" basic rates discussed by the FLSA. In essence, the rate reduction policy, as

---

[6] It bears noting that the "basic rate" at issue in this case also is not "substantially equivalent to the straight-time average hourly earnings of the employee over a representative period of time," as it is simply a reduced hourly rate. If this rate was otherwise authorized by the Administrator under § 548.4, the same has not been asserted by either party.

alleged and established by the evidence before the Court, provides class members a choice, accept a reduced regular rate or stop working overtime.  It bears noting that the preamble to the PMWA provides: "[Employees] employed in such occupations are not as a class on a level of equality in bargaining with their employers in regard to minimum fair wage standards, and 'freedom of contract' as applied to their relations with their employers is illusory."  43 P.S. § 333.101.  The Supreme Court of Pennsylvania has explained as follows with respect to the payment of overtime to individuals paid an hourly rate, such as the class members in this case:

> [The overtime compensation] requirement is fairly straightforward for employees who earn a set hourly wage as it merely requires multiplying the number of hours over forty by one and one-half times the hourly rate.  The determination of what constitutes "one and one half times the regular rate," however, is more complicated for employees who are paid pursuant to non-hourly compensation arrangements, including payment for work completed, commissions, or salaries.

*Chevalier*, 220 A.3d at 1040.

In the Court's research as to "basic rates" and "agreements or understandings" of employers and employees concerning "basic rates" in both the PMWA and FLSA contexts, the Court has found no case allowing for or even discussing a policy similar to the rate reduction policy.  Rather, "basic rates" are nearly always discussed in the context of employees who receive a guaranteed, fixed weekly salary or employees whose wage fluctuates or involves bonuses, commissions, or incentives in addition to an hourly rate.  Courts addressing such issues routinely note that the "basic rate" provisions do not apply to employees who are strictly paid an hourly rate. The United States District Court for the Northern District of California has explained:

> Plaintiff contends that 29 C.F.R. § 548.3(e) does not apply because that section only applies to calculation of overtime pay in accordance with Section 7(g)(3) of the FLSA.  Plaintiff contends that Section 7(g)(3) of the FLSA does not apply to employees like plaintiff with a single hourly rate of pay.  Section 7(g)(3) applies to employees paid at a "basic rate" that is "substantially equivalent to the average hourly earnings of the employee."  29 U.S.C. § 207(g)(3); 29 C.F.R. § 548.2. Plaintiff argues that a "basic rate" under this section must necessarily be something

other than a singular hourly rate of pay, otherwise the "basic rate" would always be exactly equal to the employee's "average hourly earnings" and Section 7(g)(3) would have no meaning.

The Court agrees with plaintiff.  As explained in 29 C.F.R. § 548 .100(a),

> The purpose of Section 7(g)(3) of the act, and subpart A of this part, is to provide an exception from the requirements of computing overtime at the regular rate, and to allow, under specific conditions, the use of an established "basic" rate instead.  Basic rates are alternatives to the regular rate of pay under section 7(a), and their use is optional.  The use of basic rates is principally intended to simplify bookkeeping and computation of overtime pay.

29 C.F.R. § 548.100(a).  The regulations provide numerous requirements that an employer must satisfy in order to use a basic rate.  For example[,] Section 548.3, titled "Authorized basic rates," sets forth numerous conditions that "will be regarded as being substantially equivalent to the average hourly earnings of the employee ... and may be used in computing overtime compensation for purposes of section 7(g)(3) and section 548.2."  For example, one authorized basic rate is "a rate per hour which is obtained by dividing a monthly or semi-monthly salary by the number of regular working days in each monthly or semi-monthly period or hours in the normal or regular workday."  29 C.F.R. § 548.3(a).

Defendant has not cited any authority for the proposition that an employee earning a single hourly rate is an employee paid at a "basic rate" under Section 7(g)(3).  The cases cited by defendant do not involve application of Section 7(g)(3) to an employee with a single hourly rate of pay.

*Provine v. Off. Depot, Inc.*, No. C 11-00903 SI, 2012 WL 2711085, at *5 (N.D. Cal. July 6, 2012); *see also Verderame v. RadioShack Corp.*, 31 F. Supp. 3d 702, 704 (E.D. Pa. 2014) ("The calculation becomes trickier however, when the employee is paid a *fixed salary* for a job whose hours vary from week-to-week." (emphasis added)); *Hunter v. Sprint Corp.*, 453 F. Supp. 2d 44, 57 (D.D.C. 2006) ("What the *Missel* and *Belo* decisions make clear is that the overtime compensation due to an employee will vary depending on whether the employment agreement is characterized as a fixed-wage contract or as an hourly rate contract."); *Barragan v. Home Depot U.S.A., Inc.*, No. 3:19-cv-01766-AJB-AGS, 2021 WL 3634851, at *8 (S.D. Cal. Aug. 17, 2021) ("But as set forth in 29 C.F.R. § 548.100(a), the purpose of Section 7(g)(3) of the FLSA, is to

provide an *exception* from the requirements of computing overtime at the regular rate. It logically follows that a basic rate will necessarily be different from the straight time hourly rate in order to give the provision any meaning."); *Acosta v. Min & Kim Inc.*, No. 15-CV-14310, 2018 WL 500333, at *5; *9 (E.D. Mich. Jan. 22, 2018), aff'd, 919 F.3d 361 (6th Cir. 2019) ) (rejecting defendants' argument that "they can agree on a 'regular rate' at any amount they desire, as long as the rate is in excess of the minimum wage, and that because they paid their employees in excess of the minimum wage, they are not in violation of the FLSA"; and separately holding "29 U.S.C. § 548.2(e) requires that the 'basic rate' be approved by the Administrator, which admittedly it was not, or fall within one of the enumerated authorized rates under 29 C.F.R. § 548.3, which it did not either."). These holdings, in this Court's estimation, track with the defined "authorized basic rates" set forth at 29 C.F.R. § 548.3, as discussed above.

The evidence before the Court indicates that the "basic rate" under the rate reduction policy was not defined for the employee unless and until that employee worked overtime, and the method of calculation is not set forth in the emails sent to employees or the employment documents they received upon commencement of employment.[7] What Defendants advocate for would allow an employer to, in essence, unilaterally require an employee to, during the course of their employment, either entirely forego working overtime to maintain their regular rate of pay or continue to work overtime at a rate less than what both the PMWA and FLSA would otherwise

---

[7] *See Friedrich v. U.S. Computer Sys., Inc.*, No. CIV. A. 90-1615, 1996 WL 32888, at *10 (E.D. Pa. Jan. 22, 1996) ("This wording provides that the 'agreement or understanding' must reach not just the existence of a 'basic rate' but also the means of computing it.").

require.[8] [9]  *See* Br. in Supp. 1, ECF No. 88 ("The question at the heart of this case is whether an employer may reduce the hourly pay rates of employees who work over 40 hours a week for no reason other than the fact that they are working overtime." (emphasis omitted)).  The Court, again, has found no support for such a policy, and Defendant cites to none.  *See Turner v. Mercy Health System*, No. 03670, 2010 WL 6761223 (Pa.Com.Pl. Mar. 10, 2010) ("The fact that there is an agreement between Turner and his class members and Defendants that sets forth a regular rate and sets forth the 8-80 Period does not mean that Defendants are not required to pay one and a half times the regular rate to employees who work more then forty hours during the workweek.  34 Pa.Code §231.43(d) does not permit employers and employees [to agree] to violate the MWA.").

The Court has noted all of the above for the purposes of illustrating that, if the agreements relied upon by Defendants in opposing class certification are per se void as a matter of law, then Plaintiffs are correct that one answer will apply to all class members.  That question can be resolved by the Court well in advance of trial in this matter, and this specific issue is essential to Defendants'

---

[8] The evidence before the Court tends to indicate that employees not only earned less than what would be required under the PMWA and the FLSA, but that their regular rate was reduced so that they, in essence, received their original regular rate for all hours worked, including overtime hours.  *See* ECF No. 88-3 at 76:13-23 (Uday Roy explaining that the formula utilized in calculating the new basic rate was intended to ensure that the employee would make at least their former regular rate of $10 per hour for all hours worked, including overtime hours).  That is, their hourly salary was reduced to a point that the extra amount paid in overtime resulted in the employees receiving payment equivalent to their original regular rate multiplied by total hours worked.  As alleged and on the evidence before the Court, the rate reduction policy apparently operates as a method to ensure that an employee earns the same hourly rate whether they work overtime or not.

[9] It bears noting that an employer can modify the salary of an at-will employee so long as appropriate notice is provided.  *See* 43 P.S. § 260.4 ("It shall be the duty of every employer to notify his [employees] at the time of hiring of the time and place of payment and the rate of pay . . . and any change with respect to any of these items prior to the time of said change." (emphasis added)).  The evidence of record does not indicate that Defendants intended to reduce class members' wages under 43 P.S. § 260.4.  *See* ECF No. 88-3 at 49 ("[The Pennsylvania Department of Labor & Industry] even told me that I have the right to reduce people's pay as long as I give them a one-week notice.  And whether they agree or not agree, I can actually do it.  *But I never -- we never did that.*" (emphasis added)).  Rather, in opposing class certification, Defendants rely on 34 Pa. Code § 231.43(d) in arguing that the class members and Defendants reached an agreement or understanding as to a basic rate of pay.  *See* Resp. 13, ECF No. 91.  It bears again noting that Defendant's policy, in essence and based upon the evidence before the Court, essentially offered class members the choice to work 40 hours or less at their regular rate or work more than 40 hours at the same regular rate.

opposition to both the PMWA class and the Unjust Enrichment class.[10]  *See* Br. in Supp. 12, ECF No. 88 ("Plaintiffs' unjust enrichment claims are premised on the theory that the rate reduction policy and practice was illegal under the FLSA and/or PMWA, and so any 'agreements' to work at the reduced rates are void and invalid under Pennsylvania law.").

While the Court has so explained, it acknowledges that this issue is, quite obviously given the Court's discussion above, underdeveloped in the parties' briefing.  While it is not the Court's typical practice to wade into the merits of a defense at the class certification stage, it believes that Defendants' argument opposing class certification required the same.  While the Court is confident in its holding herein, the Court also acknowledges that it has not yet been presented with a summary judgment motion.  Given the nature of this issue and the fact that the parties intend to file dispositive motions on this issue, *see* ECF No. 96 at ¶ 8, the Court can address any concerns with the holdings herein when such motions are filed.  The Court is satisfied, however, that this case can proceed as a class action at this time.  The Court will also consider a motion for decertification if and when appropriate.  *See* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment.").

Turning to the commonality requirement in light of the Court's holdings above, and as this Court previously explained in granting conditional certification on Plaintiffs' FLSA claims, the rate reduction policy is readily identified and evidenced by the exhibits submitted by Plaintiff, and is quite clearly set forth in the provisions of the "Orientation Program Guidelines" and the Employee Handbook quoted above, as well as Policy #2014-07 (ECF No. 88-7).[11]  Plaintiffs assert

---

[10] The parties have already represented that they intend to file dispositive motions on this issue: "Plaintiffs and Defendants also both intend to file motions for summary judgment seeking a ruling as to legality of Defendants' challenged practice under the FLSA, the PMWA, and the doctrine of unjust enrichment, and both sides agree that such motions should be filed following the Court's ruling on class certification."  ECF No. 96 at ¶ 8.

[11] While Defendants offer a justification for the rate reduction policy other than a desire to lower overtime costs, the Court notes that the plain language of the policy itself provides: "The company also desires to control the cost of

that each and every class member worked overtime and was illegally paid at a reduced rate, and argue that, if the rate reduction policy was unjust or illegal as applied to Plaintiffs, it was unjust or illegal as to each class member.  Br. in Supp. 13, ECF No. 88.  They assert that each class member agreed to work overtime at the reduced rate proffered by Defendants, but that Defendants had no legal justification for lowering class members' rates, and that any such agreement is per se void as a matter of law.  Accordingly, Plaintiffs have asserted a uniform illegal employment practice that they allege was applied to each of the class members.  The evidence they have submitted along with the Motion to Certify supports that assertion.  Defendant's own payroll records can be, and have already been, utilized to identify the individuals that were subjected to the rate reduction policy, and to what degree.  The Court finds that the commonality factor has been satisfied in this matter.

### C.  Typicality

"The typicality inquiry is intended to assess whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented."  *Baby Neal for & by Kanter v. Casey*, 43 F.3d 48, 57 (3d Cir. 1994) (citing 3B MOORE & KENNEDY, ¶ 23.06–02; 1 NEWBERG & CONTE, § 3.13).  The Third Circuit has explained that the following "three distinct, though related, concerns" are relevant considerations in assessing typicality:

> (1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class.

---

overtime by discouraging employees from working overtime on a consistent basis because it not only adds extra cost to the business but also reduces the  opportunity for creating additional/ new jobs/positions within the company, which is important to  the organization."  ECF No. 88-7.

*In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 599 (3d Cir. 2009).

Defendant relies on a materially similar argument to that discussed above in arguing that typicality has not been satisfied in this matter. Given the Court's analysis above, the Court finds that the typicality inquiry has been satisfied in this matter. "Where an action challenges a policy or practice, the named plaintiffs suffering one specific injury from the practice can represent a class suffering other injuries, so long as all the injuries are shown to result from the practice." *Baby Neal*, 43 F.3d at 58. As discussed above, Plaintiffs have pointed to a uniform employment policy of paying employees a reduced rate if they elected to work overtime. Plaintiffs' claims are aligned in terms of both legal theory and factual circumstances.

**D. Adequacy**

The adequacy inquiry involves a determination as to: "(1) whether the representatives' interests conflict with those of the class and (2) whether the class attorney is capable of representing the class." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 185 (3d Cir. 2001). The adequacy requirement "also functions as a catch-all requirement that 'tend[s] to merge with the commonality and typicality criteria of Rule 23(a)." *Newton*, 259 F.3d at 185 (quoting *Amchem*, 521 U.S. at 626 n.20). Plaintiffs offer plenty in support of counsel's capability of representing the proposed classes, as well as Ms. Wofford's and Ms. Sears's adequacy as class representatives. *See* Br. in Supp. 14-16. Defendants offer no opposition to these assertions. The Court finds that the adequacy requirement has been satisfied.

**E. Rule 23(b)(3)**

As noted, Plaintiffs seek class certification pursuant to Rule 23(b)(3), which requires that common questions of law or fact predominate and that a class action is the superior method for adjudication. The Third Circuit further "requires that a Rule 23(b)(3) class also be 'currently and

readily ascertainable.'"  *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 469 (3d Cir. 2020) (quoting *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012)).  Defendants again rely on materially similar arguments to those discussed and addressed above in arguing that Plaintiffs have not satisfied the predominance or superiority requirements.

### 1.  Predominance

"The predominance inquiry seeks to resolve whether there are 'reliable means of proving classwide injury[.]'"  *Reyes*, 802 F.3d at 489 (quoting *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252–53 (D.C. Cir. 2013)).  The United States District Court for the Eastern District of Pennsylvania has explained:

> Class certification under Rule 23(b)(3) is appropriate only if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members."  Fed.R.Civ.P. 23(b)(3).  The predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).  This requirement is considerably more demanding than Rule 23(a)'s commonality prerequisite and "imposes a more rigorous obligation upon a reviewing court to ensure that issues common to the class predominate over those affecting only individual class members." *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 297 (3d Cir. 2011).

*City of Sterling Heights Gen. Employees' Ret. Sys. v. Prudential Fin., Inc.*, No. CIV.A. 12-5275, 2015 WL 5097883, at *10 (D.N.J. Aug. 31, 2015).

Defendants' arguments as to predominance are materially identical to those raised as to commonality, which the Court addressed at length above.  For the same reasons discussed with respect to commonality, the Court finds that the predominance requirement is satisfied.

### 2.  Superiority

The superiority inquiry requires that the Court consider whether a class action "is superior to other available methods for fairly and efficiently adjudicating the controversy."  Courts look to the following in making such a determination:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

"In assessing whether a class action is a superior method of adjudication, we must balance the fairness and efficiency of the class action against other alternative forms of resolution, such as individual lawsuits or consolidation." *Bing Li v. Aeterna Zentaris, Inc.*, 324 F.R.D. 331, 345 (D.N.J. 2018) (quoting *In re Rent–Way Sec. Litig.*, 218 F.R.D. 101, 121 (W.D. Pa. 2003)). Given the number of class members and the relatively low amounts at issue on each of their claims, adjudication of this matter on a class-wide basis is the superior method of adjudication. Further, a class action is more efficient, and will allow Plaintiffs and Defendants "to avoid duplicative expenses and take advantage of economies of scale which they would otherwise lack." *Bing Li*, 324 F.R.D. at 346 (quoting *In re DVI Inc.*, 249 F.R.D. at 200). Defendants argue that, given the issues discussed above, litigation of Plaintiffs' claims on a class-wide basis would result in more than one hundred individual mini trials as to both liability and damages. Resp. 18, ECF No. 91. As discussed above, the Court will be required to determine whether the agreements relied upon by Defendants are enforceable as a matter of law. That reality will ensure that the claims of the class members will not result in minitrials. Plaintiffs have satisfied the superiority requirement.

### 3. Ascertainability

With respect to ascertainability, Plaintiffs must show that "(1) the class is defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism

for determining whether putative class members fall within the class definition." *Hargrove*, 974 F.3d at 469–70 (quoting *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015)).  Plaintiffs assert that "Defendants have already identified members of the FLSA collective based on a definition that, but for the relevant date range, is identical to the class definitions proposed here[,]" and that the "vast majority of the proposed class can be readily identified from Defendants' records by identifying communications to those employees that their hourly rates were being reduced and confirming through the ADP payroll records and/or Seba Abode's list of 'base rates' that employees received payment at those lower rates."  Br. in Supp. 19, ECF No. 88.  Defendants offer no opposition to this issue.  The Court finds the ascertainability requirement to be satisfied in this matter.

### F.  Trial Plan

For similar reasons to those advanced with respect to suitability, Defendants suggest that Plaintiffs have not proposed an adequate trial plan.  *See* Resp. 19, ECF No. 91 ("Testimony from each individual plaintiff and class member is not a suitable 'trial plan' for class-wide adjudication since it merely provides answers to the individualized inquiries of the individuals testifying.").  The Court has found the suitability requirement to be satisfied in this matter, and thus rejects Defendants' assertions respecting a trial plan.

### IV.   Conclusion

For the reasons discussed above, the Court will grant the Motion to Certify.  An appropriate Order of Court follows.

BY THE COURT:

*/s/Robert J. Colville*
Robert J. Colville
United States District Judge

DATED: August 1, 2023

cc: All counsel of record