**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| KWEILIN WOFFORD and TARA SEARS, individually and on behalf of others similarly situated, | ) ) ) ) | No. 2:20-cv-00084-RJC |
| Plaintiffs, | ) ) | Judge Robert J. Colville |
| v. | ) ) ) | |
| SEBA ABODE, INC., d/b/a BRIGHTSTAR CARE and RANJANA ROY, as Administratrix of the Estate of Uday Sankar Roy, Deceased, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**OPINION**

Robert J. Colville, United States District Judge

Before the Court are cross-Motions for Summary Judgment (ECF Nos. 123 and 126) filed by Plaintiffs Kweilin Wofford and Tara Sears ("Plaintiffs") and by Defendants Seba Abode, Inc. d/b/a Brightstar ("Seba Abode") and Ranjana Roy, as Administratrix of the Estate of Uday Sankar Roy, Deceased[1] (collectively, "Defendants"). Each side moves for summary judgment in their respective favor on liability as to each of Plaintiffs' claims set forth in the operative Second Amended Complaint (ECF No. 55) ("Complaint"), which include: Count I – violation of the Fair Labor Standards Act ("FLSA"); Count II – violation of the Pennsylvania Minimum Wage Act ("PMWA"); and Count III – unjust enrichment. The Court has jurisdiction over Plaintiffs' FLSA claim pursuant to 28 U.S.C. § 1331, and has supplemental jurisdiction over their state-law claims pursuant to 28 U.S.C. § 1367. The pending Motions for Summary Judgment have been fully briefed and are ripe for disposition.

---

[1] The Court will refer to Uday Roy as "Mr. Roy" herein.

## I.      Procedural History & Factual Background

Generally speaking, each Motion for Summary Judgment addresses the same issues.  The primary issue, the legality of a pay practice utilized by Defendants, was also placed at issue by the parties and considered by the Court in its Memorandum Opinion (ECF No. 106) ruling on Plaintiffs' Motion for Class Certification (ECF No. 87).  Despite some facial disagreements, the central facts at issue are, essentially, uncontested.

The core issue that remains to be resolved at this juncture is a legal one, whether Defendants' "rate reduction policy," which will be defined in further detail below, was legal under the FLSA and the PMWA.  If it was not, Plaintiffs will inevitably prove successful on their claims, and are entitled to summary judgment on liability.  If it was, Defendants are entitled to summary judgment on each of Plaintiffs' claims.  As noted, the Court addressed this issue in some detail in its prior Memorandum Opinion on class certification, while reserving final judgment until the parties had an opportunity to brief the issue via dispositive motions.

The parties filed their Motions for Summary Judgment on November 16, 2023.  With respect to Plaintiffs' Motion for Summary Judgment, the parties have filed the following relevant docket entries: the Motion itself (ECF No. 123); a Brief in Support with attached Exhibit (ECF No. 125); a Brief in Opposition (ECF No. 134); a Reply Brief (ECF No. 136); a Concise Statement of Material Facts with attached Exhibits (ECF No. 130); a Response to Plaintiffs' Concise Statement with attached Exhibits and an Additional Statement of Facts (ECF No. 135); and a Response to Defendants' Additional Statement of Facts (ECF No. 137).  With respect to Defendants' Motion for Summary Judgment, the parties have filed the following relevant docket entries: the Motion itself (ECF No. 126); a Brief in Support with attached Exhibit (ECF No. 127); a Brief in Opposition (ECF No. 131) with attached Exhibit; a Reply Brief with attached Exhibits

(ECF No. 138); a Concise Statement of Material Facts (ECF No. 128); a Response to Defendants'
Concise Statement (ECF No. 132); a Reply to Plaintiffs' Response to Defendants' Concise
Statement (ECF No. 139); an Appendix of Exhibits (ECF No. 129); a Responsive Appendix of
Exhibits (ECF No. 133); and a Supplemental Appendix of Exhibits (ECF No. 140).  Other relevant
docket entries include the Complaint (ECF No. 55); Defendants' Answer (ECF No. 62); the
Court's Memorandum Opinion (ECF No. 52) on conditional certification; the Court's
Memorandum Order (ECF No. 54) on Plaintiffs' Motion to Amend; and the Court's Memorandum
Opinion (ECF No. 106) on class certification.

Unless otherwise noted, the following facts are not in dispute:

Seba Abode is a third-party home health agency doing business as BrightStar Care that
provides in-home care services for elderly individuals and individuals with disabilities, who are
Seba Abode's clients.  ECF No. 135 at ¶ 1.  Seba Abode employs "caregivers" to provide in home
care services for their clients in the clients' residences.  *Id.* at ¶ 3.  Seba Abode provides paychecks
to their caregivers, who receive an hourly wage, and the caregivers are not employed by Seba
Abode's clients and are not paid by Seba Abode's clients.  *Id.*  Seba Abode operates four franchises
of BrightStar Care in Pennsylvania, including in Erie, Monroeville, Cranberry, and Mt. Lebanon.
*Id.* at ¶ 2.  For most of Seba Abode's clients, insurance companies or "managed care organizations"
reimbursed the company for the hours worked by caregivers at a set hourly rate – for Allegheny
County, where most clients lived, the rate was approximately $17.50.  *Id.* at ¶ 12.  While the hourly
rates that Seba Abode paid caregivers varied, the starting base hourly rate was generally $10.00
per hour, with the option of additional hourly pay above base hourly rates in the form of incentives
or differentials.  *Id.* at ¶¶ 13-14.

Mr. Roy owned 50% of Seba Abode through a profit-sharing plan and was the president of the company.  ECF No. 135 at ¶ 4.  Mr. Roy earned a salary from Seba Abode and occasionally received distributions from Seba Abode's profits.  *Id.* at ¶ 5.  Mr. Roy testified as follows as to his role with Seba Abode: "I have overall responsibility for running the company, that includes all aspects of the business, including sales, marketing, operations, payroll, processing, caregiving, operations.  One hundred percent in all aspect[s]."  *Id.* at ¶ 6.  Mr. Roy had the authority to discipline, hire, and fire employees, had control over Seba Abode's policies and procedures, and was responsible for setting the caregivers' hourly rates of pay.  *Id.* at ¶¶ 7-9.  Mr. Roy had access to and control over Seba Abode's payroll records and was responsible for the company's compliance with the FLSA and PMWA.  *Id.* at ¶¶ 10-11.

From January 17, 2016 until March of 2020, *see* ECF No. 137 at ¶ 4, Seba Abode maintained a company policy (the "rate reduction policy") whereby hourly caregivers who regularly worked over 40 hours in a week would be presented with the option of either: (1) limiting their weekly schedules to 40 hours or less and maintaining their current base hourly rate; or (2) continuing to work over 40 hours per week at a new, reduced base hourly rate, ECF No. 135 at ¶ 17.  Mr. Roy created and implemented the rate reduction policy.  *Id.* at ¶ 18.  He did so after speaking with and seeking guidance from the Pennsylvania Department of Labor and Industry ("DLI").  ECF No. 137 at ¶ 2.  The rate reduction policy is described in Policy # 2014-7, which was approved by Seba Abode's board of directors, including Mr. Roy, and which provides:

> It is BrightStar Care's policy to pay overtime premium pay to every non-exempt employee according to Commonwealth's Overtime and Minimum Wage Act (42 P.S. §§ 333.101 - 333.115).  The company also desires to control the cost of overtime by discouraging employees from working overtime on a consistent basis because it not only adds extra cost to the business but also reduces the opportunity for creating additional/ new jobs/positions within the company, which is important to the organization.

. . . .

4.  In order to control the overtime cost, payroll department will regularly monitor the number of worked by each employee every week.

5.  If an employee is found to be working overtime hours (more than 40 hours per week) on consistent basis, the company may consider reducing employee's hourly pay rate based on the following guidelines:

> a.   No employee's pay rate can be reduced retroactively, means, the company must pay full premium / overtime pay to the employee for the hours the said employee has already worked.

> b.  Payroll department will notify the employee (in writing) that employee is found to be working overtime hours on consistent basis and the organization reserves the right to lower the employee's base pay rate unless the employee chooses not to work overtime hours going forward.

> c.   The employee also must be notified the new / expected pay rate if the employee chooses to work overtime hours.

> d.   If the employee chooses to work overtime hours at employee's sole discretion, the employee must be also notified that any adjustment / reduction in pay rate cannot be reversed for at least 2 weeks, if the employee decides not to work overtime hours moving forward.

6.  Under no circumstances any employee's base pay rate can be varied week to week basis in order to avoid the cost of overtime.  Any pay reduction can only be instituted after monitoring the employee's weekly schedule for past week (s) and going forward, after notifying the employee of any potential pay reduction and after giving the employee opportunity of not working overtime hours going forward.

ECF No. 130-6.

The relevant Seba Abode Employee Handbook, which was designed to familiarize employees with Seba Abode's policies, rules, and other key aspects of Seba Abode, ECF No. 135 at ¶ 23, provides:

**2.2 Types of Worker**

This section distinguishes between the different types of workers the Company employs.  Employee status is established at the time of hire and may only be altered via a written statement signed by the Company.

*Exempt vs Non-Exempt*

The majority of employees are non-exempt, meaning they are entitled by law to at least minimum wage and premium pay for overtime.  Exempt employees are not subject to these laws.  Exempt status is defined by particular standards set by state law and the Federal Labor Standards Act (FLSA).  This class of employee is usually an executive, an administrator, or a highly paid specialist such as a programmer.

*Regular Employees*

Regular employees work a regular schedule, either on a full-time or part-time basis.  All field employees are hired as part-time due to their own availability which must match the hours available by our clients.  To be considered full-time, an employee must work a maximum of 40 hours per week.  Any regular employee who chooses to work above 40 hours a week is able to do so, but will be subject to a deduction in pay as based upon the number of hours agreed to per week at the discretion of the Payroll department.

Compl. Ex. A at 5, ECF No. 55-1.  The Employee Handbook further provides:

**3.2 Wages**

Wages vary from employee to employee and are based on level of skill and the needs of our clients.  The Company conducts regular evaluations of all employees and issues promotions as it sees fit.  Orientation for all regular employees in [sic] paid after all pre-employment forms are submitted and the employee works 40 hours.

In additional [sic] to regular pay, employees may have the option of earning overtime pay.

*Overtime*

A non-exempt employee may work overtime on the terms defined by Pennsylvania law pending prior authorization by his or her manager.  As mentioned previously, any employees [sic] who chooses to work above 40 hours per week on an ongoing and continuous basis, will be subject to a pay deduction based on the number of hours works per week.  All deductions will be announced prior to the change, as dictated by Pennsylvania law.

ECF No. 130-7 at 4.  Seba Abode's "Orientation Program Guidelines" during the timeframe relevant herein provided:

C. You are responsible for keeping track of your own hours.  You may work no more than forty hours weekly to remain at your base rate of $9/hour.  You are not required to work overtime.  Therefore, if you choose to work overtime (above 40 hours per week), you are subject to a pay adjustment which will be announced to you in writing prior to the change.

ECF No. 130-8.

As to the basis for the creation of the rate reduction policy, Mr. Roy testified that Seba Abode was in a "Catch-22 situation" because the hourly reimbursement rate the company received from insurance companies for each hour worked by a caregiver was a flat hourly rate, regardless of whether the hour worked was an overtime hour, and "there is no way I can pay [an employee] time and a half on 80 hours a week and be in business."  ECF No. 135 at ¶ 21.  In implementing the rate reduction policy, Seba Abode's management employees, including Mr. Roy, periodically reviewed caregivers' pay records to determine if any of them worked more than 40 hours per week. *Id.* at ¶ 27.  After reviewing these records, Seba Abode management would determine whether to present such caregivers with the option of either: (1) limiting their weekly schedules to 40 hours or less and maintaining their current base hourly rate; or (2) continuing to work over 40 hours per week at a new, reduced base hourly rate.  *Id.* at ¶ 28.  This choice was typically presented to employees via an email such as the one addressed to Ms. Wofford from Seba Abode's vice president of operations filed at ECF No. 130-9, which provides:

> I understand that you are currently working and [sic] average of 48 hours per weeks [sic] and you are scheduled for the same number of hours going forward, which puts you in an overtime situation.  We offer our employees opportunity to work overtime (at their own choice) but, unfortunately, it requires an adjustment in the employee's hourly pay rate.  <u>In your case, it means, going forward your pay rate will be $9.25 per hour.</u>

> Please note that you also have a choice to work only up to 40 hours per week which will not require any adjustment in your pay rate.  Please call your office or email us immediately – if you wish to go with that choice.  Also, please note that once you choose to work overtime and your hour pay rate is adjusted, it won't be revised again, if you do not work overtime for a week in between or if you are still scheduled to work overtime.  It will only be adjusted back to the prior rate once you have worked two consecutive weeks with 40 hours or less and you no longer are scheduled more than 40 hours per week.

ECF No.130-9.  All modifications to caregivers' rates of pay were prospective changes, and the base rate remained the modified amount unless it was again changed at a later date.  ECF No. 137 at ¶ 5.  Such changes were not implemented on a week-to-week basis, and the total amounts paid to workers ultimately varied based on the number of hours worked.  *Id.* at ¶ 8.  Defendants did not reduce pay rates unless the employee agreed to the reduction, and they honored the employee's choice.  ECF No. 132 at ¶¶ 10; 35.

In calculating the new rate of pay an employee would receive going forward if they continued to work overtime, Defendants utilized a formula contained in an Excel spreadsheet titled the "Field Employee Pay Calculator."  ECF No. 135 at ¶ 29.  Plaintiffs assert, and, despite Defendants' assertions to the contrary, the evidence supports, that "[t]he purpose of the formula in the Field Employee Pay Calculator was that the employee's weekly earnings with a time and a half premium for overtime hours at the new, reduced base hourly rate would approximate what the employee would have received had she been paid her original base hourly rate for those weekly hours without a time and a half premium for overtime hours."  ECF No. 135 at ¶ 30; *see also* ECF No. 130-2 at 76:13-23 (Uday Roy explaining: "Ten dollar an hour, they work 50 hours, so base rate is $400 up to 40 hours.  And then for 10 hours, it would be time and a half.  So, that would be 15 dollar an hour for the overtime hours.  So, for 10 hours, it will be $150.  So, overall they're making $550 if we -- they remained in 50 hours in that way.  *So, what we did is that we basically calculated what adjustments is required in their base pay rate so that they do not get less than $500 for working 50 hours*[,]" i.e., $10 per hour (their prior regular rate) multiplied by 50 hours (emphasis added)).[2]  With respect to the Field Employee Pay Calculator formula, Mr. Roy testified

---

[2] Mr. Roy also testified somewhat equivocally that Seba Abode *may* have tried to approximate a new rate of $10.50 for all hours worked when the employee had a regular rate of $10.00 to "incentivize" overtime without cost to the company.  *See* ECF No. 130-2 at 78:10-79:5.  This testimony is not explored in any detail by either party.  In any event, it cannot be questioned that the new regular rate attempting to approximate a $10.50 rate for all hours worked

that "[w]e wanted to keep people overall incentivized without an additional cost to the company." ECF No. 135 at ¶ 32.

If a caregiver continued to work more than 40 hours per week, his or her "base rate" in Seba Abode's internal system and in the ADR payroll system would be changed from his or her original base hourly rate to the new, reduced base hourly rate. ECF No. 135 at ¶ 33. If a caregiver elected to work fewer than 40 hours per week, his or her original base hourly rate remained unchanged. *Id.* at ¶ 34. If a caregiver elected a schedule with fewer hours and a higher rate of pay, Seba Abode paid the caregiver at that higher rate even if the caregiver worked more than 40 hours in a workweek going forward. ECF No. 132 at ¶ 36. If an employee declined a rate change, Seba Abode sometimes had to find another caregiver to handle the work, but at other times simply did not change the caregiver's original base rate of pay. *Id.* at ¶ 38.

Kweilin Wofford worked for Seba Abode as a caregiver beginning in March of 2018, and her offer letter stated that her "base hourly pay rate" would be $10.00 per hour on weekdays and $11.00 per hour on weekends. ECF No. 135 at ¶ 35-36. For approximately her first nine months with Seba Abode, Ms. Wofford worked a schedule wherein she consistently worked fewer than 40 hours per week, and her rate of pay remained unchanged during this time. ECF No. 132 at ¶ 18. Beginning in December of 2018, Ms. Wofford began working four 12-hour shifts each week, two during the week and two on weekends, and for the next several months was paid $10.00 per hour for shifts during the week and $11.00 for weekend shifts, with overtime calculated based upon those pay rates. ECF No. 135 at ¶ 37.

---

would, in nearly all instances, lead to a lower paycheck than if Defendants paid the employee their regular rate ($10.00) for the first forty hours and time-and-a-half ($15.00) for all hours worked above forty. In any event, this is, in the Court's estimation, a damages question.

On May 9, 2019, Ms. Wofford received the above-quoted email from Seba Abode's vice president of operations.  ECF No. 135 at ¶ 38.  After receiving the email, Ms. Wofford called her branch manager to express that she thought that a rate reduction would be unfair.  *Id.* at ¶ 39.  On May 30, 2019, Seba Abode's vice president sent Ms. Wofford a second, essentially identical email, except that the second email offered a new adjusted hourly pay rate of $9.65.  *Id.* at ¶ 40.  Ms. Wofford affirmatively elected to continue working more than 40 hours per week, *see* ECF No. 137 at ¶ 12, and, effective June 1, 2019, her base rate was changed in Seba Abode's internal system from $10.00 to $9.75, ECF No. 135 at ¶ 41.  During the pay period ending June 7, 2019, Ms. Wofford was paid a base rate of $9.75 per hour for the first time.  ECF No. 132 at ¶ 25.  This base rate applied regardless of the number of hours Ms. Wofford worked until Defendants discontinued the rate reduction policy, and, during that time, she occasionally worked 40 or fewer hours per week at that rate and on occasion worked more than 48 hours at that rate, with overtime being calculated based upon that rate.  ECF No. 132 at ¶ 25; ECF No. 137 at ¶ 13.

Before her hourly rate was reduced, Ms. Wofford's gross pay was $546 when she worked 48 hours per week (including 24 hours for which she earned $10 per hour and 24 hours for which she earned $11 per hour) and was paid 150% of her average hourly rate of $10.50 for the eight overtime hours.  ECF No. 135 at ¶ 43.  After her hourly rate was reduced, Ms. Wofford's gross pay was $507 when she worked 48 hours per week and was paid 150% of her new, reduced hourly rate of $9.75 for the eight overtime hours.  *Id.* at ¶ 45.

Tara Sears worked for Seba Abode as a caregiver beginning in April of 2019, and her offer letter stated that her "base hourly pay rate" would be $10.00 per hour on weekdays and $11.00 per hour on weekends, which are the rates she was paid upon being hired.  ECF No. 135 at ¶¶ 46-48.  For the work weeks corresponding with her paychecks dated November 1, 2019, November 8,

2019, and November 15, 2019, Ms. Sears worked 73 hours, 80.5 hours, and 84 hours, respectively. *Id.* at ¶ 49. Based on her original base hourly rates of $10 for the week and $11 for weekends, with a 150% premium for overtime hours applied to her average hourly rate, Ms. Sears's gross pay was $931.96 for the week of November 1 and $1,052.18 for the week of November 8. *Id.* For the week of November 15, during which 32 of the 84 hours were paid at a rate of $12 per hour, Ms. Sears's gross pay was $1,180.75. *Id.*

On November 18, 2019, Seba Abode's vice president of operations sent an email to Ms. Sears materially similar to the one that was sent to Ms. Wofford, except that, because Ms. Sears had worked an average of 84 hours per week, the email stated that Ms. Sears's new pay rate would be reduced to $8.30 if she elected to continue working overtime. ECF No. 135 at ¶ 50. After continuing to work her regular schedule, Ms. Sears's rate of pay was changed in Seba Abode's internal system from $10.00 to $8.30, and she was subsequently paid a reduced hourly rate of $8.30. *Id.* at ¶¶ 51-52. Seba Abode's vice president of operations emailed Ms. Sears again on November 25, 2019 to confirm Ms. Sears's acceptance of the new rate for her 84 hour per week schedule, and Ms. Sears responded that she intended to continue working an 84 hour per week schedule at the new pay rate. ECF No. 132 at ¶¶ 30-31. For the work week corresponding with her paycheck dated December 27, 2019, Ms. Sears worked 85 hours, and her gross pay was $892.25. ECF No. 135 at ¶ 55.

Effective February 17, 2020, Seba Abode changed Ms. Wofford's and Ms. Sears's base rates in its internal system back to $10.00 per hour. ECF No. 135 at ¶ 56. Seba Abode ended the rate reduction policy altogether effective March 2020, limited affected employees' weekly hours to forty when possible, and reinstated employees' original base rates going forward. *Id.* at ¶ 57.

In 2014, the DLI audited Seba Abode's pay practices for compliance with the PMWA. ECF No. 132 at ¶ 6.  In connection with that audit, Mr. Roy contacted the DLI for guidance as to PMWA compliance and the lawfulness of Seba Abode's pay practices.  *Id.* at ¶ 7.  The DLI investigator Mr. Roy spoke to informed Mr. Roy that employee agreements to prospective pay rate changes are legal and stated that Mr. Roy's policy "looked good" to the investigator.  *Id.* at ¶ 8. This conversation led to the creation of the rate reduction policy.  *Id.* at ¶ 9.

In 2017, the DOL audited Seba Abode's pay practices for compliance with the FLSA.  ECF No. 132 at ¶ 11.  In connection with that 2017 audit, a DOL investigator did not find that Seba Abode's pay practices violated the FLSA, and a Wage and Hour Investigative Support and Reporting Database ("WHISARD") Report prepared by the investigator noted that "the employer must be able to make some adjustment to remain profitable" and that "there [was] no system in place or automatic change dependent on the employee's number of hours."  *Id.* at ¶ 12.  In March of 2020, the DOL again audited Seba Abode's pay practices for compliance with the FLSA, reviewing two years of Seba Abode's payroll records as a part of that audit.  *Id.* at ¶¶ 13-14. Following the 2020 audit, the DOL informed Seba Abode that it found minor discrepancies in Seba Abode's pay practices, but did not explicitly note any issue with the rate reduction policy. *Id.* at ¶ 15.

## II.    Legal Standard

Summary judgment may be granted where the moving party shows that there is no genuine dispute about any material fact, and that judgment as a matter of law is warranted.  Fed. R. Civ. P. 56(a).  Pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case, and on which he or she will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*,

477 U.S. 317, 322 (1986).  In evaluating the evidence, the court must interpret the facts in the light

most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor.

*Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).

"The moving party bears the initial burden of identifying evidence which demonstrates the

absence of a genuine issue of material fact."  *Bavone v. Primal Vantage Co., Inc.*, No. 2:21cv1260,

2024 WL 756815, at *1 (W.D. Pa. Feb. 21, 2024).  When the moving party carries their burden,

the summary judgment "opponent must do more than simply show that there is some metaphysical

doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

586 (1986).  Further:

> A non-moving party may not successfully oppose a summary judgment motion by
> resting upon mere allegations or denials contained in the pleadings, or by simply
> reiterating those allegations or denials in an affidavit.  *Lujan v. National Wildlife
> Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).  Rather, the
> non-moving party must offer specific evidence found in the record that contradicts
> the evidence presented by the movant and indicates that there remain relevant
> factual disputes that must be resolved at trial.  *See id*.  If the non-moving party does
> not respond in this manner, the court, when appropriate, shall grant summary
> judgment.  Fed.R.Civ.P. 56(e).

*Mahaven v. Pulaski Twp.*, 139 F. Supp. 2d 663, 664–65 (W.D. Pa. 2001), *aff'd*, 45 F. App'x 155

(3d Cir. 2002); *see also Bavone*, 2024 WL 756815, at *1 ("Likewise, mere conjecture or

speculation by the party resisting summary judgment will not provide a basis upon which to deny

the motion.").

In ruling on a motion for summary judgment, the court's function is not to weigh the

evidence, make credibility determinations, or determine the truth of the matter; rather, its function

is to determine whether the evidence of record is such that a reasonable jury could return a verdict

for the nonmoving party.  *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150–51

(2000) (citing decisions); *Anderson v. Liberty Lobby*, 477 U.S. 242, 248–49 (1986); *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 n. 3 (3d Cir. 1998).

The mere existence of a factual dispute, however, will not necessarily defeat a motion for summary judgment. Only a dispute over a material fact—that is, a fact that would affect the outcome of the suit under the governing substantive law—will preclude the entry of summary judgment. *Liberty Lobby*, 477 U.S. at 248.

### III.    Discussion

As noted, the legality of the rate reduction policy under the FLSA and PMWA is the most pressing contested issue before this Court. This is a legal issue that does not turn on disputed facts, and the issue is thus primed for disposition on summary judgment. If the rate reduction policy was illegal under either the FLSA or the PMWA, Plaintiffs would prove successful on their respective claims under those Acts, as well as on their unjust enrichment claim, as illegal contracts cannot be used to defeat claims for unjust enrichment under Pennsylvania law. On the other hand, if the rate reduction policy was legal under both the FLSA and PMWA, Defendants will inevitably be successful in this litigation. It bears further noting, and as will be summarily addressed below, Defendants have essentially conceded that Mr. Roy was an "employer" under the FLSA and PMWA, and, even if they had not done so, Mr. Roy's deposition testimony makes plain that he was an employer. The Court will address each issue presented in the Motions for Summary Judgment in turn.

### A.    FLSA

The Court begins by noting that Defendants' recitation of the law is generally sensible and, in this Court's estimation, mostly accurate.[3]  The Court's confusion sets in when Defendants

---

[3] The Court will address some of Defendants' more hyperbolic assertions respecting the potential implications to existing precedent should the Court rule in Plaintiffs' favor below.

attempt to describe the rate reduction policy itself, as they simply mischaracterize the express terms of the policy or the purpose behind it, as described very plainly in Seba Abode's policies, manuals, and emails and by Mr. Roy during his deposition.  At times, it seems as though Defendants describe the facts as they wished they were, i.e., describing a legal policy under the FLSA, as opposed to what the record in this case truly supports.

Perhaps most confusingly, Defendants frequently and consistently characterize the rate reduction policy to provide for a "*one-time permanent* change to Plaintiffs' base rate of pay" in arguing that the policy was legal.  ECF No. 127 at 10 (emphasis added).  Characterizing the rate reduction policy to provide for one-time, permanent adjustments is simply, and completely, contrary to the evidence of record, and in particular the policy's plain and express terms.  The rate reduction policy itself provides: "If the employee chooses to work overtime hours at employee's sole discretion, the employee must be also notified that any adjustment / reduction in pay rate *cannot be reversed for at least 2 weeks*, if the employee decides not to work overtime hours moving forward."  ECF No. 130-6 (emphasis added)).  Further, in an email to Ms. Wofford, Defendants' vice president of operations provided as follows:

> Also, please note that once you choose to work overtime and your hour pay rate is adjusted, it won't be revised again, if you do not work overtime for a week in between or if you are still scheduled to work overtime. *It will only be adjusted back to the prior rate* once you have worked two consecutive weeks with 40 hours or less and you no longer are scheduled more than 40 hours per week.

ECF No. 88-10 (emphasis added); Compl. ¶ 43, ECF No. 55.  Quite plainly, the reduction could not be "permanent" if Defendants were prepared to adjust an employee's pay rate back if that employee stopped working overtime.

Given the plain language of the rate reduction policy and Seba Abode's email communications, the following statement in Defendants' Reply Brief is, frankly, baffling: "Any

rate reductions were only made prospectively *and with the intent that the rate change would apply to all workweeks in the future, regardless of whether the employee's future hours changed*." ECF No. 138 at 2 (emphasis added); *see also* ECF No. 127 at 5 ("[T]he FLSA does not prohibit one-time prospective pay rate changes that apply to all future workweeks *and without regard to whether an employee works overtime*." (Defendants' emphasis omitted; Court emphasis added)). That is, quite literally, the opposite of what the rate reduction policy and the above email communicate, as they explicitly state that the employee's pay rate will revert when the employee stops working overtime. Future changes to an employee's pay rate based upon a change in future hours are entirely accounted for, and anticipated by, the policy itself and in the emails sent to employees.

Further, there is nothing in the policies and manuals at issue that indicates that a second reduction could not occur if an employee resumed working overtime after they had previously had their rate reduced for working overtime but then stopped working overtime and thus had their rate adjusted back to the original rate. The policy further provides no limit as to the number of reductions that could occur if an employee who previously had their rate reduced for working overtime began working a substantially higher number of overtime hours. Defendants acknowledge that multiple adjustments occurred on at least two occasions. *See* ECF No. 138 at 5 ("Plaintiffs attempt to analogize *Thompson* to this case by pointing to two examples of employees who had more than one pay rate change."). Further, there is evidence of record that multiple adjustments to employee pay rates occurred in this case. *See* ECF No. 131 at 5 n.3 ("Employee No. 637067's rate went from $10.50 to $9.95 on December 25, 2017, to $9.15 on February 26, 2018, and to $10.25 on April 16, 2018. Likewise, Employee No. 640273's rate went from $10.25 to $9.75 on October 24, 2016, to $9.25 on April 10, 2017, to $8.40 on April 17, 2017, and to $10

on July 3, 2017." (citing ECF No. 130-4 at 5-6); *see also* ECF No. 129-3 at 7 (noting 5 incidents of multiple adjustments). The Court does not find support in the record for Defendants' characterization of the rate reduction policy to provide for "one-time" and "permanent" pay rate changes, as it, in fact, provides for neither.

The Court further fails to find support in the record for another statement made by Defendants, specifically that Plaintiffs "have failed to identify record evidence to support the conclusion that any of those pay rate changes were related to the employees' hours worked." ECF No. 138 at 5. The Court acknowledges that this statement is explicitly meant to address only those workers who had their pay rate adjusted more than once. Regardless of whether Defendants meant this as a blanket statement as to all Plaintiffs[4] or just the individuals who had their rates changed multiple times, Defendants' policies and manuals, its communications to employees, and Mr. Roy's own statements entirely contradict any assertion that hours worked was not the sole driving motivation behind the decision to reduce an employee's regular rate. *See* ECF No. 130-7 at 4 ("As mentioned previously, any employees [sic] *who chooses to work above 40 hours per week* on an ongoing and continuous basis, *will be subject to a pay deduction based on the number of hours works per week*." (emphasis added)); *see also* Compl. Ex. A at 5, ECF No. 55-1 (Any regular employee *who chooses to work above 40 hours a week* is able to do so, *but will be subject to a deduction in pay as based upon the number of hours agreed to per week* at the discretion of the Payroll department." (emphasis added)); ECF No. 130-8 ("Therefore, *if you choose to work overtime* (above 40 hours per week), *you are subject to a pay adjustment* which will be announced

---

[4] The same is certainly likely, as Defendants acknowledge that the FLSA prohibits "pay rate practices that are intended to avoid payment of a premium rate of pay (i.e., one and one-half times the employee's regular rate of pay) for hours worked over 40 in a workweek." ECF No. 127 at 6. In any event, the Eleventh Circuit has explained: "The difference between a permissible reduction in an employee's non-overtime hourly rate and an impermissible one comes down to whether the rate change 'is justified by no factor other than the number of hours' an employee worked." 29 C.F.R. § 778.327(b)." *Thompson v. Regions Sec. Servs., Inc.*, 67 F.4th 1301, 1310 (11th Cir. 2023).

to you in writing prior to the change."); ECF No.130-9 ("We offer our employees *opportunity to work overtime* (at their own choice) but, unfortunately, *it requires an adjustment in the employee's hourly pay rate.*  In your case, it means, going forward your pay rate will be $9.25 per hour.  Please note that you also have a choice to work only up to 40 hours per week *which will not require any adjustment in your pay rate.  . . .*  Also, please note that once you choose to work overtime and your hour pay rate is adjusted, *it won't be revised again, if you do not work overtime for a week in between or if you are still scheduled to work overtime.  It will only be adjusted back to the prior rate once you have worked two consecutive weeks with 40 hours or less and you no longer are scheduled more than 40 hours per week*." (emphasis added)).  The number of hours worked was plainly the barometer for when the rate reduction policy was utilized.

This point is further driven home by Mr. Roy's testimony as to Defendants' recalculation of Seba Abode's employees' pay rate, wherein he also discusses how the Field Employee Pay Calculator essentially approximated a "straight time" pay rate for all hours worked:

> Q    Well, in other words, if an employee had a $10.50 hourly rate, and they've worked 53 hours and were paid $10.50 for all 53 hours, isn't the product of that multiplication the same as if the employee received time and a half for hours worked at 9.35 beyond the 40?

> A    Yeah, that's correct.

> Q    So, the policy that Seba used allowed the company to pay the same amount of wages that it would have otherwise paid if it had not paid time and a half at the old rate, but kept the old rate the same?

> . . . .

> A    The policy that Seba Abode followed -- or the practice -- practice is a better word than policy.  The practice we followed is that we have given our employees a choice to work overtime or not work overtime.  *If they have taken the option of not working overtime, their pay remains unchanged, whatever that is.  If they've decided to go with overtime and they insisted on overtime of their own will, we let them know beforehand that there will be a reduction in their base pay rate.*  And if they agreed on that, this is a calculator we have internally used.  This is not sent to

18

our employees or anybody.  This is internally we use to make sure that we pay them fair, we pay people a little bit more than even their base rate, that's why we use that $10.50 rather than using 10 dollar[s].  We wanted to keep people overall incentivized without an additional cost to the company.  Exactly the way that the document that you referenced before as a policy document discussed.

ECF No. 130-2 77:22-79-9 (emphasis added).  Mr. Roy's interrogatory responses further indicate:

From January 17, 2016 through March 2020, Uday Roy periodically reviewed pay records of Seba Abode's caregiver employees *to determine if any employee worked more than 40 hours per week.  If an employee worked more than 40 hours per week in one or more workweeks*, Mr. Roy decided whether to offer the employee the option of continuing to work at the employee's existing rate of pay or prospectively accepting a new rate of pay if the employee chose to work more than 40 hours in a workweek.  *If an employee chose to work more than 40 hours in a workweek, Mr. Roy and/or Ms. Bisbee determined how much such individual should be paid per hour based on the number of hours they were expected to work.  If an employee chose to work fewer than 40 hours per week, their rate of pay remained unchanged.*

ECF No. 130-3 at 10 (emphasis added).  Again, the above quoted language makes clear that the number of hours worked by an employee and an employee's commencement of working overtime solely drove Defendants' rate reduction policy.[5]

Having dispensed with the above factual inconsistencies, the Court turns to the FLSA generally. Section 207 of the FLSA provides that:

[N]o employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an

---

[5] The Court notes that there is some testimony and evidence regarding certain employees who might have chosen to continue working overtime because they provided care to family members, and a brief statement that Defendants could not pay employees 1.5 times their rate on 80 hours and stay in business.  *See* ECF No. 135 at ¶ 21; ECF No. 130-2 at 37-44.  Defendants advance no true argument that these bases, as opposed to a desire to control overtime costs by decreasing pay rates, were the reason Defendants chose to implement the rate reduction policy.  The statement respecting "staying in business" was hyperbole, and there is no suggestion that Defendants were on the verge of going out of business absent a rate reduction.  The evidence is overwhelming that the only basis for the rate reduction policy was to reduce overtime costs to the company while still allowing employees to work overtime.  *See* ECF No. 140-1 at 65:7-15 ("I'm not aware of any kind of internal threshold, if that's what you're asking for.  Our -- in general, it was that if somebody's working 40 hours a week and working consistently for 40 hours a week, if somebody did it one week here, one week there, we didn't even bother to reach out to them.  We only reached out to the people that are working consistently all the time over 40 hours.").  It bears noting that the previous quote indicates that the rate reduction policy was implemented not only discretionarily, but also somewhat arbitrarily.  Only some employees were asked to waive their rights under the FLSA and PMWA by agreeing to a pay rate deduction for working overtime, while others were permitted to work overtime without such a deduction.  This shows Defendants' intent was to avoid paying overtime to those who might cost Defendants the most in overtime compensation.  On the record before the Court, no reasonable jury could find in Defendants' favor that any other basis supported the rate reduction policy.

enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1).  This section "expresses the intention of Congress 'to require extra pay for overtime work by those covered by the Act even though their hourly wages exceeded the statutory minimum.'"  *Bay Ridge Operating Co. v. Aaron*, 334 U.S. 446, 460 (1948) (quoting *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 577 (1942)).  "The purpose was to compensate those who labored in excess of the statutory maximum number of hours for the wear and tear of extra work and to spread employment through inducing employers to shorten hours because of the pressure of extra cost."  *Bay Ridge Operating Co.*, 334 U.S. at 460; *see also Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419, 423–24 (1945) ("Thus by increasing the employer's labor costs by 50% at the end of the 40-hour week and by giving the employees a 50% premium for all excess hours, Section 7(a) achieves its dual purpose of inducing the employer to reduce the hours of work and to employ more men and of compensating the employees for the burden of a long workweek.").

"Every contract of employment, written or oral, explicitly or implicitly includes a regular rate of pay for the person employed."  *Bay Ridge Operating Co.*, 334 U.S. at 461.  "While the words 'regular rate' are not defined in the Act, they obviously mean the hourly rate actually paid for the normal, non-overtime workweek."  *Walling v. Helmerich & Payne*, 323 U.S. 37, 40 (1944).  "If the employee is employed solely on the basis of a single hourly rate, the hourly rate is the 'regular rate.'"  29 C.F.R. § 778.110.  "Where an employee in a single workweek works at two or more different types of work for which different nonovertime rates of pay (of not less than the applicable minimum wage) have been established, his regular rate for that week is the weighted average of such rates."  29 C.F.R. § 778.115.

So long as the minimum hourly rate requirements of the FLSA are respected, "the employer and employee are free to establish [the] regular rate at any point and in any manner they see fit." *Youngerman-Reynolds Hardwood Co.*, 325 U.S. at 424. "But this freedom of contract does not include the right to compute the regular rate in a wholly unrealistic and artificial manner so as to negate the statutory purposes." *Helmerich & Payne*, 323 U.S. at 42. The Supreme Court has explained:

> The regular rate by its very nature must reflect all payments which the parties have agreed shall be received regularly during the workweek, exclusive of overtime payments. It is not an arbitrary label chosen by the parties; it is an actual fact. Once the parties have decided upon the amount of wages and the mode of payment the determination of the regular rate becomes a matter of mathematical computation, the result of which is unaffected by any designation of a contrary 'regular rate' in the wage contracts.

*Youngerman-Reynolds Hardwood Co.*, 325 U.S. at 424-25; *see also Watkins v. Hudson Coal Co.*, 151 F.2d 311, 317 (3d Cir. 1945) ("[T]he regular rate, however established, must be a bona fide rate and not a fictitious one.").

FLSA regulation 29 C.F.R. § 778.316, titled "Agreements or practices in conflict with statutory requirements are ineffective," provides:

> While it is permissible for an employer and an employee to agree upon different base rates of pay for different types of work, it is settled under the Act that where a rate has been agreed upon as applicable to a particular type of work the parties cannot lawfully agree that the rate for that work shall be lower merely because the work is performed during the statutory overtime hours, or during a week in which statutory overtime is worked. Since a lower rate cannot lawfully be set for overtime hours it is obvious that the parties cannot lawfully agree that the working time will not be paid for at all. An agreement that only the first 8 hours of work on any days or only the hours worked between certain fixed hours of the day or only the first 40 hours of any week will be counted as working time will clearly fail of its evasive purpose. An announcement by the employer that no overtime work will be permitted, or that overtime work will not be compensated unless authorized in advance, will not impair the employee's right to compensation for work which he is actually suffered or permitted to perform.

29 C.F.R. § 778.316.  With respect to "artificial regular rates," the FLSA regulations state that the hourly rate cannot "vary from week to week inversely with the length of the workweek."  29 C.F.R. § 778.500(b).  The regulations further provide the following illustrative example of an improper pay practice:

> However, reduction on a more temporary or sporadic basis presents a different problem.  It is obvious that as a matter of simple arithmetic an employer might adopt a series of different rates for the same work, varying inversely with the number of overtime hours worked in such a way that the employee would earn no more than his straight time rate no matter how many hours he worked.  If he set the rate at $6 per hour for all workweeks in which the employee worked 40 hours or less, approximately $5.93 per hour for workweeks of 41 hours, approximately $5.86 for workweeks of 42 hours, approximately $5.45 for workweeks of 50 hours, and so on, the employee would always receive (for straight time and overtime at these "rates") $6 an hour regardless of the number of overtime hours worked.  This is an obvious bookkeeping device designed to avoid the payment of overtime compensation and is not in accord with the law.  *See Walling v. Green Head Bit & Supply Co.*, 138 F. 2d 453.  The regular rate of pay of this employee for overtime purposes is, obviously, the rate he earns in the normal nonovertime week—in this case, $6 per hour.

29 C.F.R. § 778.327.

With respect to permissible rate changes, the United States Court of Appeals for the Eleventh Circuit has explained:

> As we've noted, employers like Regional Security can lawfully reduce an employee's weekly average rate, as long as they do not do so as a work-around of the FLSA's overtime-pay requirements. . . .
>
> The difference between a permissible reduction in an employee's non-overtime hourly rate and an impermissible one comes down to whether the rate change "is justified by no factor other than the number of hours" an employee worked.  29 C.F.R. § 778.327(b); *see also* [*Parth v. Pomona Valley Hosp. Med. Center*, 630 F.3d 794, 797 (9th Cir. 2010)] (holding that an employer "may reduce" an employee's weekly average rate "so long as the rate reduction was not designed to circumvent" the FLSA's overtime provisions).  When a reduction in an employee's non-overtime hourly rate is justified by the length of his workweek, "the device is evasive and the rate actually paid in the shorter or non[-]overtime week is his regular rate for overtime purposes in all weeks."  29 C.F.R. § 778.327(b).

*Thompson v. Regions Sec. Servs., Inc*., 67 F.4th 1301, 1310 (11th Cir. 2023).

In *Walling v. Green Head Bit & Supply Co.*, 138 F. 2d 453, the United States Court of Appeals for the Tenth Circuit was faced with the scenario discussed in the example at 29 C.F.R. § 778.327, explaining:

> [The employer] entered into oral contracts with its [employees].  Each contract provided that if the employee worked 42 hours or less per week from October 22, 1939, to October 22, 1940, he would be paid at the rate of 50 cents per hour; that if he worked in excess of 42 hours in any work week *his regular rate of compensation would be reduced* so that compensation at such reduced regular rate for 42 hours, plus one and one-half times such reduced regular rate for the hours in excess of 42 in such work week, would equal 50 cents per hour for the total number of hours worked.  In other words, the employer and each [employee] agreed that the latter's compensation should be 50 cents per hour for 42 hours or less in any work week, but that if he worked hours in excess of 42, *the regular rate would be so reduced that the application of the statutory requirement of one and one-half times such regular rate for the overtime would result in the employee receiving 50 cents per hour straight time*.  Thus, it will be seen that if a [employee] worked 42 hours or less, he received 50 cents per hour straight time.  *If he worked in excess of 42 hours, he still received 50 cents per hour straight time*.
>
> . . . .
>
> In the instant case, there was no weekly guaranty.  What was guaranteed was a stipulated hourly wage, and the employee received that hourly wage and no more and no less, regardless of the number of hours he worked, whether the hours worked equaled, were less, or were more than the statutory maximum.  *He did not know in advance how much his regular rate would be reduced by the application of the contract formula.  It depended wholly on the number of overtime hours he worked.*  He only knew that whether he worked regular time or regular time and overtime, he would receive compensation at the same stipulated rate per hour for all of the hours worked.

*Green Head Bit & Supply Co.*, 138 F.2d at 454-55 (emphasis added).  The Tenth Circuit held:

> We think the contract, in substance, was an agreement to pay a stipulated rate per hour for all hours worked and no extra pay for overtime, and that the agreement to so reduce the regular rate, dependent on the number of overtime hours worked, so as to obtain that result, *was a device to avoid the provisions of the Act.*

*Id.* at 455 (emphasis added).

In *Walsh v. Kynd Hearts Home Healthcare, LLC*, 644 F. Supp. 3d 180 (E.D. Va. 2022), the United States District Court for the Eastern District of Virginia held that the "[d]efendants violated [FLSA] overtime requirements in two ways: (1) by explicitly paying the regular rate to employees for time worked in excess of forty hours each week, and (2) by reducing employees' regular rate in weeks when overtime was worked." *Kynd Hearts Home Healthcare, LLC*, 644 F. Supp. 3d at 186. The *Kynd Hearts* court explained that "[m]odifying an employee's 'regular rate' to avoid payment of overtime premiums is unlawful." *Id.* In *McFarlane v. Harry's Nurses Registry*, 17-CV-06350 (PKC) (PK), 2020 WL 1643781 (E.D.N.Y. Apr. 2, 2020), the United States District Court for the Eastern District of New York granted summary judgment in favor of employees when faced with the following scenario:

> With only a few aberrations, Plaintiffs were generally paid an hourly rate of $19.00 when they worked 40 or fewer hours in one week. However, when Plaintiffs worked more than 40 hours in one week, this hourly rate was adjusted downwards in proportion to the number of overtime hours worked. In practice, this meant that Plaintiffs were never paid more than approximately $19.00 per hour, regardless of how many hours they worked overtime. "A regular rate will not be recognized when it is set in a 'wholly unrealistic and artificial manner as to negate the statutory purpose' of the FLSA." *Switzoor v. SCI Eng'g, P.C.*, No. 11-CV-9332 (RA), 2013 WL 4838826, at *4 (S.D.N.Y. Sept. 11, 2013) (quoting *Walling v. Helmerich & Payne, Inc.*, 323 U.S. 37, 42 (1944)); *see also id.* ("[E]ven when wages exceed the minimum prescribed by Congress, the parties to the contract must respect the statutory policy of requiring the employer to pay one and one-half times the regular rate for all hours worked in excess of 40." (quoting *Helmerich & Payne, Inc.*, 323 U.S. at 42)).

*McFarlane*, 2020 WL 1643781, at *10.

The United States District Court for the Middle District of Florida was presented with the following scenario in *Malamphy v. Abundant Life Home Health Agency, Inc.*:

> Here, the parties disagree on the appropriate "regular rate" of pay for each putative class member. The Plaintiff claims each putative class member was hired at an agreed upon "regular rate," but that the Defendants unilaterally lowered the "regular rate" during periods in which the employees worked overtime. Specifically, the Plaintiff claims that under the Defendants' scheme, the putative

class members received the same gross compensation regardless of whether they worked forty or more hours per week. The Defendants dispute that they unilaterally lowered employees' rate of pay to avoid paying overtime. To the contrary, the Defendants claim that in order to accommodate the scheduling wishes of their employees, *employees may mutually agree with the Defendants to receive a reduced "regular rate" for each pay period during which the employees wish to work overtime.* Stated differently, the Defendants contend that the *putative class members' "regular rate" fluctuates depending on whether they choose to work overtime, and any changes to the "regular rate" are made pursuant to a mutual agreement with the employee.*

*Malamphy v. Abundant Life Home Health Agency, Inc.*, No. 8:16-CV-327-T-17TGW, 2017 WL 2876310, at *2 (M.D. Fla. May 4, 2017) (emphasis added). The *Malamphy* court held as follows as to the pay practice at issue:

Even if the putative class members agreed to accept reduced rates of pay during periods in which they worked more than 40 hours per week, the actual rates paid for normal, non-overtime workweeks are as reflected above. Thus, regardless of whether the reduction in the putative class members' rate of pay was consensual or unilateral, it cannot be disputed that the putative class members received less than their "regular rate" of pay during at least some weeks in which they worked overtime. *Since parties "cannot bargain away the employees' rights under the FLSA," any decision by the Defendants to pay the putative class members a reduced rate of pay during periods in which they worked more than 40 hours per week necessarily violated the FLSA.*

*Id.* at *3 (emphasis added).

In *Thompson v. Regions Security Services, Inc.*, the Eleventh Circuit addressed the following pay practice in ruling on a motion for judgment on the pleadings:

When Thompson became a security guard for Defendant-Appellee Regional Security Services, Inc., his established regular rate was $13.00, and he typically worked a forty-hour week. But seven months after Regional Security first started scheduling Thompson to work overtime, it reduced his rate to $11.15 per hour. About a year later, Regional Security stopped scheduling Thompson to work overtime hours and at the same time restored his non-overtime pay rate to $13.00 per hour.

*Thompson v*, 67 F.4th at 1304. The Eleventh Circuit explained:

Thompson's allegations support his theory that Regional Security set an artificial $11.15 rate during the year that it scheduled him to work significant overtime hours

so that it could avoid paying him $19.50 (one-and-a-half times his $13.00 rate) for his overtime hours. Indeed, during the year that Thompson worked significant overtime hours, his reduced $11.15 rate caused him to earn on average $13.00 per hour for all sixty hours in a sixty-hour workweek. Plus, Regional Security immediately reverted to paying Thompson's $13.00 rate when it stopped scheduling him to work overtime hours.

Because these allegations plausibly support Thompson's claim that Regional Security reduced Thompson's regular rate to avoid paying him overtime compensation, we conclude that Regional Security's motion for judgment on the pleadings was required to be denied.

*Thompson*, 67 F.4th at 1304. The *Thompson* court also cited *Brunozzi v. Cable Commc'ns, Inc.*, 851 F.3d 990, 997 (9th Cir. 2017) for its holding that an "agreement, practice, or device that lowers the hourly rate during statutory overtime hours or weeks when statutory overtime is worked is expressly prohibited under" the DOL's interpretive regulations, and further cited Les A. Schneider & Larry J. Stine, *Wage and Hour Law: Compliance and Practice* § 9:1 (2023) for the following proposition: "The FLSA regulations expressly prohibit any agreement, practice, or device that provides for a lower hourly rate to be paid during . . . weeks when overtime is worked." *Id.* at 1308-09. It further cited 29 C.F.R. § 778.327 for the proposition that "this non-circumvention rule prevents an employer from playing with an employee's hours and rates to effectively avoid paying time-and-a-half for an employee's overtime hours. Otherwise, an employer could use 'simple arithmetic' to lower an employee's rate and increase his hours so that he could never earn time-and-a-half pay—'no matter how many hours he worked.'" *Id.* at 1309.

In granting summary judgment in the plaintiff employee's favor on FLSA overtime liability following remand, the trial court in *Thompson* explained as follows in addressing an argument that has been raised by Defendants in this case:

Regions takes the position that it did not violate the FLSA because Regions offered Thompson an opportunity to make more money every week and earn regular overtime pay, which Thompson knowingly agreed to and accepted. In light of the Eleventh Circuit's *Thompson* decision, and well-established FLSA law, the Court

26

rejects Regions' argument. *Thompson's acceptance of or agreement to an artificial reduction in his regular rate in order to increase the hours in his workweek is not relevant to whether the rate reduction was lawful under the FLSA.*

*Thompson v. Regions Sec. Servs., Inc.*, No. 20-62152-CIV, 2024 WL 3090876, at *10 (S.D. Fla. Apr. 23, 2024) (emphasis added) ("*Thompson II*").[6]  It further distinguished *Walling v. A. H. Belo Corp.*, 316 U.S. 624 (1942), a case relied upon by Defendants in this matter, finding that it was "inapposite because it does not address a temporary manipulation of the regular rate in a way that allows the employer to avoid paying the overtime wage required by 29 U.S.C. § 207." *Id.* at *10. The *Thompson* trial court also rejected the employer's reliance on *Parth v. Pomona Valley Hospital*, 630 F.3d 794 (9th Cir. 2010), again a case relied upon by Defendants, finding the citation "unavailing under the undisputed facts in this case, [as] *Parth* addressed an alleged FLSA violation that conflicted with a pay schedule allowing nurses to work a 12-hour voluntary shift that had been in place for many years based upon a collective bargaining agreement between a hospital and its nurses." *Id.*  As in this case, the defendant employer in *Thompson II* conceded that the reduction in the plaintiff's non-overtime hourly rate to $11.15 was tied to an increase in the length of the plaintiff's workweek and did not present – whether disputed or undisputed – legitimate factors other than the number of hours in the plaintiff's workweek that justified the change in the plaintiff's non-overtime rate. *Id.* at * 11.

The Court will briefly address the three cases cited by Defendants in support of their argument that the rate reduction policy was lawful under the FLSA, but notes generally that it agrees with the *Thompson II* court, which was confronted with a materially similar situation to that presented herein, that *A. H. Belo Corp.* and *Parth* are readily distinguishable.  The instant case is

---

[6] This specific holding establishes that Defendants' attempt to distinguish *Thompson* on the basis that the pay rate reduction in *Thompson* was unilateral and enacted without notice to the employee is unsupportable.  *See* ECF No. 138 at 4-5.

much more factually aligned with those discussed above, and in particular *Thompson*, which involved a policy whereby an employee's pay rate was reduced when he worked overtime and was increased to the original amount once he stopped working overtime. As evidenced by Defendants' own policies and communications with its employees, that is identical to the pay practice provided for by the rate reduction policy.

*A. H. Belo Corp.*, wherein the Supreme Court described the issue presented as a "close" one, involved a pay practice that included a weekly guarantee for employees whose number of hours worked fluctuated drastically from week to week and that resulted in employees receiving overtime pay that was more than 150% of their regular rate at times and at other times receiving exactly 150% of their regular rate. *A. H. Belo Corp.*, 316 U.S. at 632. The plaintiff in *A. H. Belo Corp.* argued that "both the basic rate and the overtime rate are so 'artificial' that the parties to the contract cannot fairly be supposed to have intended that it be so construed." *Id*. The Supreme Court explained that "[i]t cannot be denied that the flexibility of the overtime rate is considerable, but this flexibility may well have been intended if it was the only means of securing uniformity in weekly income." *Id*. It further held that "the guaranty contract in this case carries out the intention of the Congress" because "[i]t specifies a basic hourly rate of pay and not less than time and a half that rate for every hour of overtime work beyond the maximum hours fixed by the Act." *Id*. at 634. The pay practice in *A. H. Belo Corp.* is not comparable to the rate reduction policy, which does not involve a weekly guarantee or an "irregular regular rate," and which was put in place simply to lower Defendants' cost of overtime by reducing the regular rate when an employee worked a certain amount of hours.

In *Parth*, the United States Court of Appeals for the Ninth Circuit held:

> When an employer changes its shift schedule to accommodate its employees' scheduling desires, the employer may reduce the employee pay rate to pay its

employees the same wages they received under the former schedule, so long as the rate reduction was not designed to circumvent the provisions (including overtime) of the Fair Labor Standards Act ("FLSA").

*Parth*, 630 F.3d at 797. That case involved a collectively bargained agreement wherein the employer allowed its nurses to choose whether to work schedules involving either 8-hour shifts or 12-hour shifts, the result of which was that "nurses[] who volunteered for the 12–hour shift schedule[] would make approximately the same amount of money as they made on the 8–hour shift schedule (*while working the same number of hours* over a 14–day period and performing the same duties)." *Id.* (emphasis added). To be sure, the 12-hour shift involved a reduction in the regular rate, but the payment of overtime for four of those hours negated any such reduction. Employees were paid the same total take-home pay on either schedule, which involved the same number of hours and the same work but different schedules. *Parth* involved an employer adjusting scheduling and pay rates for a legitimate purpose, to accommodate the scheduling desires of its employees. Here, the Court is faced with employers who have admitted that they merely reduced the regular rate based upon the number of hours worked to control and lower the cost of overtime. Plaintiffs were not paid the same amount of money for the same number of hours. The rate reduction policy is not a "pay practice [that] protects employees from the evils of overwork and underpay." *Id.* at 801. *Parth* does not support Defendants' position.[7]

Turning to the parties' arguments, the Court notes that it agrees entirely with Defendants' assertion that "it is entirely lawful to make a onetime prospective reduction to an employee's pay *as long as the employer is not intending to avoid its overtime obligations in doing so*." ECF No.

---

[7] *Conner v. Celanese, Ltd.*, also cited by Defendants, involved a substantively identical situation to that presented in *Parth*. *See Conner v. Celanese, Ltd.*, 428 F.Supp.2d 628, 637 ("Defendant did not violate the FLSA by reducing the 12[-]hour shift wage such that the annualized wages for employees would remain the same for 12 hour shift and 8 hour shift employees.").

138 at 2 (emphasis added).  The Court acknowledged as much in its Memorandum Opinion on

class certification, providing:

> It bears noting that an employer can modify the salary of an at-will employee so
> long as appropriate notice is provided.  *See* 43 P.S. § 260.4 ("It shall be the duty of
> every employer to notify his [employees] at the time of hiring of the time and place
> of payment and the rate of pay . . . and any change with respect to any of these items
> prior to the time of said change." (emphasis added)).  The evidence of record does
> not indicate that Defendants intended to reduce class members' wages under 43
> P.S. § 260.4.  *See* ECF No. 88-3 at 49 ("[The Pennsylvania Department of Labor &
> Industry] even told me that I have the right to reduce people's pay as long as I give
> them a one-week notice.  And whether they agree or not agree, I can actually do it.
> *But I never -- we never did that.*" (emphasis added)).  Rather, in opposing class
> certification, Defendants rely on 34 Pa. Code § 231.43(d) in arguing that the class
> members and Defendants reached an agreement or understanding as to a basic rate
> of pay.  *See* Resp. 13, ECF No. 91.  It bears again noting that Defendant's policy,
> in essence and based upon the evidence before the Court, essentially offered class
> members the choice to work 40 hours or less at their regular rate or work more than
> 40 hours at the same regular rate.

ECF No. 106 at 26 n.9.  While the FLSA does not address pay rate changes as explicitly as the

PMWA, it is undisputed that pay rate changes are permissible so long as they are not initiated in

violation of the requirements or purposes of the FLSA.  *See Malamphy*, 2017 WL 2876310, at *2

("Under the FLSA, parties may generally establish the 'regular rate' at any point and in any manner

they see fit, so long as the employer otherwise complies with applicable minimum wage

requirements.  [*Parth*, 630 F.3d at 799].  However, employers may not decrease employees' hourly

rate based on the number of hours worked, set the hourly rate for overtime at a rate lower than the

regular rate especially when the overtime work is identical to that performed during regular hours,

or set the hourly rate for regular work lower during weeks when overtime is worked."); *see also*

*Thompson*, 67 F.4th at 1306 ("On the other hand, under § 207, an employer can lawfully reduce

an employee's non-overtime rate in some situations.").

As briefly noted above, the Court finds that Defendants often resort to hyperbolic assertions

that any decision in Plaintiffs' favor would constitute a seismic change in the law and result in the

outlawing of all "one-time, prospective pay rate changes that apply regardless of hours worked in future workweeks." ECF No. 138 at 7; *see also* Defendants' Briefing generally.[8]  The Court states unequivocally that it in no way intends to hold that pay rate changes are per se illegal, but even Defendants acknowledge that such rate changes cannot be instituted by an employer to "avoid its overtime obligations in doing so."  ECF No. 138 at 2.  Whether the evidence supports a finding that Defendants implemented the rate reduction policy only for purposes of avoiding their FLSA and PMWA overtime obligations is what is at issue in this case, and any holding by this Court in Plaintiffs' favor thus does not stand for the sweeping proposition Defendants would impose upon the Court's ruling.

The parties are in agreement that intent, and not the mere fact of a reduction in the regular rate, is the true indicator of whether a rate reduction is permissible under the FLSA.  Defendants' intent is laid bare by the testimony of Mr. Roy, Seba Abode's policies and manuals, and its communications with its employees, as discussed at length above.  It is plain that the only purpose of the rate reduction policy was to allow for a reduction in the regular rate when an employee chose to work overtime.  It is, accordingly, likewise clear that rate reductions were justified only by the number of hours an employee worked in a given pay period and were thus illegal.  *See Thompson*, 67 F.4th at 1310 ("When a reduction in an employee's non-overtime hourly rate is justified by the length of his workweek, 'the device is evasive and the rate actually paid in the shorter or non[-

---

[8] One such example is as follows: "Such a rule would leave no room for an employer to adjust employee pay rates after losing a lucrative contract or in a situation in which the employer's contract reduces the rate the company is paid for services."  ECF No. 134 at 12; *see also id.* (discussing rate reductions where bankruptcy is in play for the employer).  That is plainly not the scenario presented herein, and the Court notes that the situations set forth by Defendants might well constitute legitimate factors other than the number of hours worked justifying a pay rate reduction.  The same would have to be considered along with all other facts surrounding the rate reduction.  The Court need not speak any further to these asserted scenarios because the Defendants here have acknowledged that the only reason that they instituted the rate reduction policy was to reduce the cost of overtime by lowering employees' regular rates once they began to work overtime, i.e., to avoid the requirements of the FLSA and PMWA.

]overtime week is his regular rate for overtime purposes in all weeks." (quoting 29 C.F.R. § 778.327(b)).

Further, the method of calculation utilized by Defendants was designed to ensure that, aside from the preceding pay period's overtime, the employee would make essentially their original regular rate for all hours worked, including overtime hours.  The case law discussed above makes clear that the same is impermissible.  The rate reduction policy flies in the face of several of the core principles of the FLSA, that is, to encourage hiring and discourage overtime by requiring the employer to compensate an employee who works overtime at a rate 1.5 times their ordinary regular rate and to ensure that employees are paid a premium when they do work overtime.  *See Thompson*, 67 F.4th at 1309–10 ("The Department's interpretation of the regular rate serves that purpose by prohibiting an employer from using 'simple arithmetic' to ensure that an employee earns no more than his non-overtime hourly rate—'no matter how many hours he work[s].'  29 C.F.R. § 778.327(a).  Without that prohibition, the FLSA would neither (1) place 'financial pressure' on employers to hire additional workers instead of scheduling their existing employees to work overtime, nor (2) ensure that employees receive additional compensation 'for the burden of a workweek in excess of the hours fixed in the Act.'  *Helmerich & Payne*, 323 U.S. at 40, 65 S.Ct. 11.").  In light of the record in this case, this Court simply cannot conclude that the rate reduction policy was legal under the FLSA.

The Court again notes that Defendants' own manuals and policies, not to mention their email communications and Mr. Roy's deposition testimony, explicitly spell out the intent behind the rate reduction policy.  The evidence before the Court essentially amounts to one implied statement from Defendants to their employees: "If you work overtime, we will dock your pay." While Defendants would obviously prefer that the Court be faced with a policy that involved "one-

time" and "permanent" reductions, the Court believes it clear that it is not faced with such a policy. Rather, it is apparent that the rate reduction policy allowed for employees to achieve their prior regular rate if they stopped working overtime, and that the policy allowed Defendants to choose when and how they would reduce workers' pay rate for working overtime.[9]  As noted throughout this Opinion, the rate reduction policy was simply and explicitly designed so that Defendants could essentially pay employees straight time when they chose to work overtime.  Mr. Roy himself admitted that he wanted to incentivize employees to work overtime without additional cost to his company.  *See* ECF No. 135 at ¶ 32.  (Mr. Roy explaining as follows with respect to the purpose behind the Field Employee Pay Calculator: "We wanted to keep people overall incentivized without an additional cost to the company.").  Again, that flies in the face of one the FLSA's most central purposes, that employees be paid the appropriate premium rate for overtime work.  The Court finds the following point made by Plaintiffs to be apt: "However, that 'additional cost to the company' is precisely how the FLSA achieves its dual purpose.  And by evading that cost, Defendants both escaped the 'financial pressure' necessary to induce them to hire new employees and . . . deprived their employees of 'additional pay to compensate them for the burden of a workweek beyond the hours fixed in the Act.'"  ECF No. 125 at 18-19 (quoting *Missel*, 316 U.S. at 577-78).

While the Court finds *Thompson* to be the closest factual fit of all of the cases discussed above, the Court also finds this case to be particularly analogous to the example of improper pay

---

[9] The Court notes that whether further readjustments of employees' pay rates actually occurred is irrelevant.  The fact that future increases should an employee cease working overtime, and potentially further decreases should they resume overtime, were contemplated by the rate reduction policy constitutes overwhelming evidence of Defendants' intent to avoid paying the required overtime premium, which is what is at issue herein.  In any event, such modifications took place in this case.  *See* ECF No. 131 at 5 n.3 ("Employee No. 637067's rate went from $10.50 to $9.95 on December 25, 2017, to $9.15 on February 26, 2018, and to $10.25 on April 16, 2018. Likewise, Employee No. 640273's rate went from $10.25 to $9.75 on October 24, 2016, to $9.25 on April 10, 2017, to $8.40 on April 17, 2017, and to $10 on July 3, 2017." (citing ECF No. 130-4 at 5-6); *see also* ECF No. 129-3 at 7 (noting 5 incidents of multiple adjustments).

practices discussed in the FLSA regulations at 29 C.F.R. § 778.327, which was based on the

scenario presented in *Green Head Bit & Supply Co.* and which states:

> It is obvious that as a matter of simple arithmetic an employer might adopt a series of different rates for the same work, varying inversely with the number of overtime hours worked in such a way that the employee would earn no more than his straight time rate no matter how many hours he worked.  If he set the rate at $6 per hour for all workweeks in which the employee worked 40 hours or less, approximately $5.93 per hour for workweeks of 41 hours, approximately $5.86 for workweeks of 42 hours, approximately $5.45 for workweeks of 50 hours, and so on, the employee would always receive (for straight time and overtime at these "rates") $6 an hour regardless of the number of overtime hours worked.  This is an obvious bookkeeping device designed to avoid the payment of overtime compensation and is not in accord with the law.

29 C.F.R. § 778.327 (citation omitted).  The Court finds that Defendants' actions in this case match

this description exceptionally well, if not perfectly in form, then certainly in substance.  The

employer in the example has devised a system whereby the employer will *never* be required to pay

the employee proper overtime.  In that way, the instant case is distinguishable because, under the

rate reduction policy, Defendants were required to pay employees the appropriate amount of

overtime for at least one pay period.  That, in this Court's estimation, is where the material

distinctions in Defendants' favor end.

    First, the policy and the example match one another in that each is transparent and

prospective.  The employer in the example tells the employee at the outset that, if the employee

works a certain amount of overtime, their regular rate will be reduced to the degree that they will

receive the same regular rate for every hour worked regardless of the amount of overtime worked.

Defendants certainly put their employees on notice at the outset of employment that any employee

who chose to work overtime would be subject to a pay deduction based upon the number of hours

worked per week, and then informed any employee subject to a deduction that, should they choose

to continue working their current schedule, their rate would be reduced moving forward such that

they would essentially be paid the same regular rate, that is, approximately $10/hour as calculated by the Field Employee Pay Calculator, for all of their hours worked.[10]

The reductions discussed in 29 C.F.R. § 778.327's example and the rate reduction policy are both plainly and explicitly based upon the number of hours worked per week, and with the same end goal in mind, reduce costs by reducing the rate of pay of those who work overtime through the payment of a reduced rate for any future overtime.  While both the example and the rate reduction policy purport to provide a "choice," i.e., the employee can choose not to work overtime, each policy is clearly designed to "control the cost of overtime" by incentivizing overtime "without cost to the company" through avoiding the payment of overtime compensation based on the true regular rate.  The employee who works overtime will, barring a dip in hours, almost surely make more money overall as opposed to those who work a forty-hour week.  But the employer, through their policy, has been able to assure that any overtime paid will significantly limit costs to the company while failing to adequately compensate the employee under the law.  In this way, both the example and policy are "bookkeeping device[s] designed to avoid the payment of overtime compensation."  29 C.F.R. § 778.327.

The FLSA regulations' example and the rate reduction policy are also similarly flexible, and, despite Defendants' assertions to the contrary, neither is necessarily a permanent or one-time change in the regular rate.  If the employee would like to return to their original rate, they need only stop working overtime.  That said, the employee under the rate reduction policy is, almost inarguably, worse off, in that they must work forty or less hours in two consecutive workweeks without being scheduled for future overtime before their rate *may* be increased, and the evidence

---

[10] The Court finds that Defendants' attempt to distinguish their rate reduction policy, which under its plain terms permitted unfettered employer discretion to reduce and reinflate pay rates based on the number of hours worked by an employee, from a pay practice that involves "payment of different base rates for non-overtime vs. overtime hours," *see* ECF No. 127 at 6, to be a distinction without a difference.

indicates that Defendants were lax in readjusting an employee's pay.  *See* ECF No. 140-1 at 63:20-22 ("Q: Okay. Was it ever a longer period of time, like, four weeks? A: Oh, yeah.").  Accordingly, the employee under the rate reduction policy would receive pay for forty hours or less potentially substantially lower than their true regular rate, whereas the employee in the example would immediately receive their regular rate upon reducing their hours.

It bears noting that Defendants were not without other options.  They could have hired more employees to avoid paying overtime rates to their current employees.  They could have simply not offered the opportunity to work overtime to their current employees.  They could have justified a company-wide rate reduction based on something other than the number of hours worked by an employee.  As discussed herein, they did none of those things.

Instead, Defendants utilized a rate reduction policy that purported to offer their employees a choice, stop working overtime and receive the same regular rate, or continue working overtime at a reduced regular rate that will, essentially, pay you your regular rate for all hours worked, so long as you maintain a consistent schedule (otherwise you will make less than your regular rate), until you stop working overtime, at which time we may return you to your original regular rate. The choice provided to employees was essentially: "work for $10/hour for 40 hours per week or work for $10/hour for 60 hours per week."  Certainly, the employee who continues to work overtime will make more money,[11] but the employers have evaded paying that employee the proper premium rate.  The fact that Defendants offered to return the employee to their original regular

---

[11] The Court notes Defendants' assertions that Mr. Roy testified that he implemented the policy so that employees would not "lose any money" and that employees still made more money than if they had only worked forty hours at their former rate, *see* ECF No. 137 at ¶¶ 6-7, but those statements ignore the fact that the employees who worked overtime made less money than the FLSA and PMWA require.  It bears noting that Mr. Roy also testified that Defendants wanted to "keep people overall incentivized," presumably to work overtime to earn more money than had they worked less than forty hours, but "without an additional cost to the company."  *See* ECF No. 130-2 at 78:10-79:5. This statement might be as probative as any made by Mr. Roy, as it acknowledges that he essentially intended that employees would continue to work overtime but that Defendants would save money by avoiding paying them the premium they were otherwise owed.

rate if the employee stopped working overtime further shines a light on the purpose behind the rate reduction policy, to come as close as possible to paying the employee straight time for all hours worked.

It is, at best, clever, if not misleading, to argue that the rate reduction policy provided employees with a choice. Defendants apparently had no issue with individuals working more than forty hours, they just were not willing to pay what was statutorily owed to employees who elected to do so. *See* ECF No. 135 at ¶ 21 ("[T]here is no way I can pay [an employee] time and a half on 80 hours a week and be in business."). While the Court fully appreciates that employers require, and are entitled to, some level of control over pay rates so that they may keep their businesses running, as discussed at length above, the Court believes that the answer was not to devise a policy that allowed the employer to lower an employee's pay rate only because that employee worked overtime.[12] Such a policy is no better than the example discussed above.

In this case, Plaintiffs' regular rates were those paid during weeks where they worked forty hours or fewer prior to any unlawful reduction. The rate reductions at issue were justified only by the number of hours an employee worked. No reasonable jury could conclude otherwise on this record. Defendants violated the FLSA by reducing employees' regular rates simply because an employee began to work overtime. Any holding to the contrary would permit employers and employees to contract away the employee's rights under the FLSA utilizing "bookkeeping

---

[12] In this way, the Court finds Defendants' attempts to distinguish week-to-week pay rate adjustment policies from the rate reduction policy to be ineffective. Both involve reductions in the regular rate if the employee "chooses" to continue to work overtime. The rate reduction policy might more accurately be described to allow for a pay period-to-pay period adjustment based on the number of hours worked, but it, in this Court's estimation, is not fundamentally distinct from a week-to-week adjustment based on the number of hours worked. The Court notes that *Thompson* also did not involve a pay practice that varied week-to-week. Any attempt to argue that the reduced pay rate was "agreed-to" in this case is also a false distinction. The employees in the week-to-week cases could be said to have "accepted" the reduced rate by continuing to work overtime after their employer lowered their pay rate for working overtime.

device[s] designed to avoid the payment of overtime compensation." 29 C.F.R. § 778.327. Summary judgment will be entered in Plaintiffs' favor as to FLSA liability.

The Court notes that, in its prior Memorandum Opinion, the Court urged the parties to be prepared to support their positions with case law. Despite the Court's invitation, Defendants have still not cited to a single case that squarely supports their position. With respect to Defendants' assertion that the dearth of case law supporting their argument indicates that the rate reduction policy is plainly a lawful practice, *see* ECF No. 134 at 2, the Court notes that this is, perhaps, one way to view it. That said, a dearth of case law could also mean, and in this Court's view does strongly suggest, the opposite, that is, that the practice at issue is so plainly unlawful that it has neither been regularly implemented nor litigated in court. The Court also notes Defendants' argument that their pay practices survived audits from the DOL and DLI, who found no overtime violations. The Court is certainly not bound by those determinations, *Parker v. NutriSystem, Inc.*, 620 F.3d 274, 278 (3d Cir. 2010), and, very respectfully, simply disagrees with those determinations.[13] Ultimately, the Court is satisfied that this case is much more akin to those cited by Plaintiffs and discussed by the Court above, and that it is readily distinguishable from those cited by Defendants. This Court holds that Plaintiffs have established that the rate reduction policy violates the FLSA.

### B. PMWA

The PMWA requires that employers pay employees for hours worked above forty hours in a work week at a rate "not less than one and one-half times the employee's regular rate." 43 P.S. § 333.104(c). The FLSA "establishes only a national floor under which wage protections cannot drop, but more generous protections provided by a state are not precluded." *Chevalier v. Gen.*

---

[13] In particular, the rate reduction policy was a system that permitted a pay rate change dependent on the employee's number of hours, a finding inconsistent with the DOL's 2017 audit. *See* No. 132 at ¶ 12.

*Nutrition Centers, Inc.*, 220 A.3d 1038, 1040 (Pa. 2019).  "Pennsylvania and federal courts look to FLSA cases for guidance when interpreting substantially parallel provisions of the PMWA." *Beauregard v. Broadway Elec. Serv. Corp.*, No. 2:21-CV-1600, 2022 WL 2293969, at *4 (W.D. Pa. June 24, 2022) (citing *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 142 (3d Cir. 2020)).  However, "Pennsylvania courts have departed from interpreting the PWMA in light of the FLSA where the legislative text and history of the PMWA do not follow that of the FLSA." *Wintjen v. Denny's, Inc.*, No. 2:19-CV-00069-CCW, 2021 WL 5370047, at *6 (W.D. Pa. Nov. 18, 2021); *see also Beauregard*, 2022 WL 2293969, at *4 ("Accordingly, the Pennsylvania General Assembly endeavored to provide 'more generous protections' to employees through enactment of the Pennsylvania Minimum Wage Act of 1968, 43 P.S. §§ 333.101–333.115." (quoting *Chevalier*, 220 A.3d at 1055)).

It bears noting that the preamble to the PMWA provides: "[Employees] employed in such occupations are not as a class on a level of equality in bargaining with their employers in regard to minimum fair wage standards, and 'freedom of contract' as applied to their relations with their employers is illusory."  43 P.S. § 333.101; *see also Barba v. New Century Chinese Buffet, Inc.*, No. 2:20-CV-01557, 2023 WL 6348825, at *6 (W.D. Pa. Sept. 29, 2023) ("Substantive rights under the FLSA and PMWA are non-waivable; even if an employee purports to agree to particular terms of employment, those terms may still violate the involved statutes.").  "The purpose of the portion of [the PMWA] requiring overtime pay is to increase employment, reduce overtime, and adequately compensate employees who must work more than a standard forty-hour workweek." *Chevalier v. General Nutrition Centers, Inc.*, No. GD-13-017194, 2014 WL 6909692, at *11 (Pa. Com. Pl. Oct. 20, 2014).

Defendants argue that they have not violated an express provision of the PMWA and thus cannot be liable under that Act.   As the Court discussed at length above, by manipulating employees' regular rates through unenforceable "agreements" to reduced regular rates based only on the number of hours worked, Defendants failed to properly compensate their employees who worked overtime at a rate that was 1.5 times their regular rate.   It is simply unsupportable to argue that an Act designed to provide even more protection than the FLSA is not violated by "contracts" that subvert the PMWA's very purpose.   *See Barba*, 2023 WL 6348825, at *6 ("Substantive rights under the FLSA and PMWA are non-waivable; even if an employee purports to agree to particular terms of employment, those terms may still violate the involved statutes.").    Defendants have thus quite clearly violated both the express provisions and core purposes of the PMWA.   The Court rejects any argument to the contrary.

To the extent that Defendants now argue that they intended to unilaterally lower employees' regular rates pursuant 43 P.S. § 260.4, the Court has already noted that such an assertion is squarely contradicted by the record, with Mr. Roy explaining: "[The Pennsylvania Department of Labor & Industry] even told me that I have the right to reduce people's pay as long as I give them a one-week notice.   And whether they agree or not agree, I can actually do it.   *But I never -- we never did that*."   ECF No. 106 at 26 n.9.   Even if Defendants did so, the pay rate reductions at issue were implemented only to avoid the requirements of the PMWA, and the same simply cannot be permissible under the Act.   The Court finds that Defendants' pay practices were illegal under the PMWA, and summary judgment will be granted in Plaintiffs' favor as to PMWA liability.

### C.  Mr. Roy's Employer Status Under the FLSA and PMWA

The FLSA defines "employer" to include "any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ."  29 U.S.C.A. § 203(d).  The United States Court of Appeals for the Third Circuit has explained that "[t]he Supreme Court has even gone so far as to acknowledge that the FLSA's definition of an employer is 'the broadest definition that has ever been included in any one act.'"  *In re Enterprise Rent-A-Car Wage & Hour Emp. Pracs. Litig.*, 683 F.3d 462, 467–68 (3d Cir. 2012) (quoting *United States v. Rosenwasser*, 323 U.S. 360, 363 n. 3, 65 S.Ct. 295, 89 L.Ed. 301 (1945)).  "Aside from the corporate entity itself, a company's owners, officers, or supervisory personnel may also constitute 'joint employers' for purposes of liability under the FLSA."  *Thompson v. Real Est. Mortg. Network*, 748 F.3d 142, 153 (3d Cir. 2014); *see also Solis v. A-1 Mortg. Corp.*, 934 F. Supp. 2d 778, 788 (W.D. Pa. 2013) ("Individuals acting in a supervisory capacity may be liable in their individual capacities as an employer under the FLSA." (citing *Haybarger v. Lawrence Cnty. Adult Prob. and Parole*, 667 F.3d 408 (3d Cir. 2012))).

In determining whether an alleged employer falls under the FLSA's definition of "employer," the Third Circuit has explained that courts should consider the following non-exhaustive list of factors:

> 1) the alleged employer's authority to hire and fire the relevant employees; 2) the alleged employer's authority to promulgate work rules and assignments and to set the employees' conditions of employment: compensation, benefits, and work schedules, including the rate and method of payment; 3) the alleged employer's involvement in day-to-day employee supervision, including employee discipline; and 4) the alleged employer's actual control of employee records, such as payroll, insurance, or taxes.

*In re Enterprise*, 683 F.3d at 469.  The Third Circuit further explained that the above list of factors "cannot be 'blindly applied' as the sole considerations necessary to determine joint employment,"

and that, "[i]f a court concludes that other indicia of 'significant control' are present to suggest that a given employer was a joint employer of an employee, that determination may be persuasive, when incorporated with the individual factors we have set forth."  *Id.* at 469-70.  This Court has previously held that the "analysis for whether an individual constitutes an 'employer' is the same under the PMWA as under the FLSA."  *Shroyer-King v. Mom-N-Pops*, LLC, No. CV 20-1558, 2021 WL 5055662, at *5 (W.D. Pa. Nov. 1, 2021).  With respect to the *Enterprise* test's "applicability in the context of the summary judgment standard," "[s]ummary judgment may be granted if 'the evidence ... so favors the [movant] that we conclude no reasonable juror could find' otherwise."  *Solis*, 934 F. Supp. 2d at 796 (quoting *In re Enterprise*, 683 F.3d at 471).

With respect to Mr. Roy, each of the *Enterprise* factors is easily met in this case, and, as noted, Defendants offer no true argument to the contrary.  Mr. Roy testified as follows as to his role with Seba Abode: "I have overall responsibility for running the company, that includes all aspects of the business, including sales, marketing, operations, payroll, processing, caregiving, operations.  One hundred percent in all aspect[s]."  ECF No. 135 at ¶ 6.  Mr. Roy had the authority to discipline, hire, and fire employees, had control over Seba Abode's policies and procedures, and was responsible for setting the caregivers' hourly rates of pay.  *Id.* at ¶¶ 7-9.  Mr. Roy had access to and control over Seba Abode's payroll records, and was responsible for the company's compliance with the FLSA and PMWA.  *Id.* at ¶¶ 10-11.  Mr. Roy himself created and implemented the rate reduction policy.  It is clear that Mr. Roy was an "employer" under the FLSA and PMWA at all times relevant herein, and no reasonable jury could conclude otherwise on this record.  Ranjana Roy, who was substituted for Mr. Roy, can thus be held liable in her individual capacity for the conduct at issue herein.

### D.  Good Faith and Willfulness

While the Court appreciates Defendants' argument that the issues of good faith and willfulness under the FLSA are ripe for resolution at this juncture, Plaintiffs correctly note that the Court limited this round of dispositive motions to the issue of the legality of Defendants' challenged pay practices under the FLSA, the PMWA, and the doctrine of unjust enrichment.  *See* ECF No. 121.  The Court has resolved that issue herein.  Defendants themselves acknowledged that full merits discovery was not complete at the time that the Court last convened a status conference in this case.  *See* ECF No. 120.  In an abundance of caution, and following review of Plaintiffs' submissions, the Court will reserve a ruling on the issues of good faith and willfulness until after discovery is complete.  The Court also notes that it appreciates Defendants' argument that any remaining discovery as to these issues might be somewhat limited.  If appropriate, and following conferral and a status conference as required by the undersigned's Standing Order and Procedures re: Civil Motion Practice, the Court will entertain argument should either party believe that the other's discovery requests are overbroad or unreasonable.

### E.  Unjust Enrichment

With respect to unjust enrichment, the Third Circuit has explained:

"An action based on unjust enrichment is an action which sounds in quasi-contract or contract implied in law."  *Discover Bank v. Stucka*, 33 A.3d 82, 88 (Pa. Super. 2011) (citation omitted).  "The elements of unjust enrichment are [ (1)] benefits conferred on defendant by plaintiff, [ (2)] appreciation of such benefits by defendant, and [ (3)] acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value."  *Id.*  "Whether the doctrine applies depends on the unique factual circumstances of each case[.]"  *Id.* (citation omitted).

"To sustain a claim of unjust enrichment, a claimant must show that the party against whom recovery is sought either wrongfully secured or passively received a benefit that it would be unconscionable for her to retain."  *Gutteridge v. J3 Energy Group, Inc.*, 2017 PA Super 150 at *6, 165 A.3d 908 (2017) (en banc) (citation

omitted).  "The doctrine does not apply simply because the defendant may have benefited as a result of the actions of the plaintiff."  *Id.* (citation omitted).

*Mark Hershey Farms, Inc. v. Robinson*, 171 A.3d 810, 817 (Pa. Super. 2017).

Plaintiffs argue that they conferred an appreciated benefit to Defendants because "Defendants' business model was based on earning reimbursements from insurance companies (or in some cases, individuals) for the hours of care provided by its employees, and as the owner of Seba Abode, Mr. Roy received a salary and profits."  ECF No. 125 at 25.  Plaintiffs argue that it would be inequitable for Defendants to retain that benefit without paying employees what they would have earned had their regular rates not been illegally reduced.  *Id.*

For their part, Defendants again argue that they entered into legally binding, lawful agreements with their employees and thus cannot be liable for unjust enrichment.  As discussed at length above, the agreements at issue are invalid, unenforceable, and a legal nullity because their only purpose was to secure a waiver of an employee's rights under the FLSA and PMWA and because they were entered into between two parties with severely unequal bargaining power. Defendants' argument fails, and the Court will grant summary judgment in Plaintiffs' favor as to liability on their unjust enrichment claim.

**IV.     Conclusion**

For the reasons discussed above, the Court will grant Plaintiffs' Motion for Summary Judgment as to Liability and deny Defendants' Motion for Summary Judgment.  An appropriate Order of Court follows.

BY THE COURT:

*/s/Robert J. Colville*
Robert J. Colville
United States District Judge

DATED: September 23, 2024

cc: All counsel of record